**SUPREME RECORDS, Inc., et al. v.
DECCA RECORDS, Inc., et al.**

No. 8929–Y.

United States District Court
S. D. California, Central Division.
May 5, 1950.

Jurisdiction was invoked by reason of diversity of citizenship. Supreme Records, Incorporated,—to be referred to as "Supreme",—and Black & White Record Distributors, Inc.,—to be referred to as "Black & White",—are California corporations. Decca Records, Inc.,—to be referred to as "Decca",—is a New York corporation. Supreme is the owner of a master recording entitled, "A Little Bird Told Me", which is an orchestration by Paula Watson, to which Black & White has the exclusive distribution rights throughout the United States, which it produces for Supreme in phonograph form. 100,000 such records have been sold and distributed as the result of large expenditures of money for promotion and exploitation.

The complaint, after reciting the facts just summarized, stated that Decca, without the permission or consent of the plaintiffs, had appropriated to its own use the Supreme musical arrangement and caused it to be reproduced on records produced by it, which, since October 25, 1948, they have sold to distributors and to the general public.

The musical arrangement contained in the Decca record is asserted to be similar to, and an imitation of, the arrangement of the plaintiff, made with the object of misleading, confusing and deceiving phonograph record dealers and the public into the belief that the product of the plaintiffs was being sold. This, together with the advertising material, labels, and other promotional material, are averred to be violative of the property rights of the plaintiff in the arrangement.

An accounting and general damages in the sum of $200,000 and punitive damages in a like sum are asked against Decca.

Decca's answer denied the violation of any rights. of the plaintiff, asserted that their record of the musical composition, made with the consent of the composer, Harvey O. Brown, was the result of the efforts of their own musical arrangers, technicians, artists and musicians, and that the successful sale of the record is the result of Decca's own ingenuity, skill, business experience and capital.

At the trial, both recordings were played several times in the courtroom. In addition to this, plaintiff had a vocalist, accompanied by a violinist, sing the original score of the song as written by the composer. One of the plaintiff's witnesses made a comparison of the similarities and dissimilarities between the two recordings.

The defendants produced as a witness an expert musician, arranger and composer, who made a like analysis. The defendants also produced and caused to be played a record of the music as written without any arrangements.

Other facts are stated in the opinion to follow.

Jacob Paull, Los Angeles, Cal., for the plaintiff Supreme Records, Inc.

Samuel Maidman, Los Angeles, Cal., for the plaintiff Black & White Record Distributors.

Averill C. Pasarow, Los Angeles, Cal., Henry Cohen, New York City, for the defendant Decca Records, Inc.

YANKWICH, District Judge (after stating the facts above).

I. The Plaintiff Has No Property Rights

As appears from the preceding statement of facts, the complaint was originally filed on behalf of Supreme Records, Incorporated, a corporation, and Black & White Record Distributors, Inc., a corporation, against the defendants Decca Records, Inc., and others.

There was a voluntary dismissal as to the defendant Capitol Records Distributing Corp. At the conclusion of the plaintiffs' case, on a motion of the defendant Decca Records, Inc., the action was dismissed as to the plaintiff Black & White Record Distributors, Inc., a corporation.

The complaint, which seeks damages, an accounting and injunctive relief, does not indicate clearly the theory upon which it was grounded. But, upon the hearing of the motion to dismiss, and at the commencement of this trial, it was stated that the sole ground on which recovery is sought is unfair competition.

The unfair competition is alleged to consist of appropriating the musical arrangement of the song "A Little Bird Told Me", as embodied in the recording made by Supreme of that song. Supreme does not own the copyright of that song, and does not claim any common law rights in it. They are still owned by the composer, who is not a party to this action and has not appeared in it as a witness for either side. In that respect, the case is unique.

Ordinarily, the composer or the owner of a copyrighted song asserts rights to the arrangement, 17 U.S.C.A. § 1. The Copyright Office recognizes this. For in the new Rules and Regulations, adopted November 29, 1949, 17 U.S.C.A. following section 207, it has provided (Sec. 201.4(b) (5) : "Adaptations and arrangements of musical compositions or musical compositions republished with new matter, including editing, when such new matter is the writing of an author, may be registered as new works under the provisions of section 7 of the Copyright Act."

The first problem which confronts us is legal: Does the record disclose the existence in the plaintiff of a property interest which it is the duty of a court of equity to protect?

■ The right to the product of one's intelligence, imagination or skill, whether in the realm of literature, music or art, was recognized by courts long before recognition was given to these rights by statute. Even today, when the right to full ownership of the product of one's literary or musical skill is infringed by others, through imitation or unauthorized appropriation, courts of equity will protect the creator, although he may not have secured for himself the added protection of statutes which provide for registration of such works. 18 C.J.S., Copyright and Literary

Property, §§ 4-16. Once the creator has availed himself of the right provided by the statute, the common law right ceases to exist. The two cannot co-exist.

In this case, it has been conceded by the plaintiff that the right asserted is not a statutory right to the song, itself, or a common-law right to it. Such right could not very well be asserted, because the composer of the song has not transferred any of his rights to the plaintiff. The plaintiff merely holds a limited right to record,—a right which the composer did not intend to be exclusive, because the record shows that he or his agent approached the defendant, and that the recording by Decca was made in pursuance to an agreement whereby they pay royalties and compensation for the privilege of recording the song. The right which the plaintiff asserts is the right to the particular arrangement of the song,— the special manner in which they recorded it. It is their claim that this is a property right which they may assert against the defendant as their competitor, even though the arrangement itself did not give rise to any rights which they might assert against the public.

The plaintiff seeks to apply to the situation confronting us in this case the principles declared by the Supreme Court in the case of International News Service v. Associated Press, 1918, 248 U.S. 215, 39 S. Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293. In that case, the court states the general principle that the right of property may exist under certain circumstances, despite the non-existence of any common-law or statutory right. They held that the misappropriation of news gathered by another agency was the subject of protection by a court of equity. The gist of the opinion is contained in the following paragraph: "Besides the misappropriation, there are elements of imitation, of false pretense, in defendant's practices. The device of rewriting complainant's news articles, frequently resorted to, carries its own comment. The habitual failure to give credit to complainant for that which is taken is significant. Indeed, the entire system of appropriating complainant's news and transmitting it as a commercial product to defendant's clients and patrons amounts to a false representation to them and to their newspaper readers that the news transmitted is the result of defendant's own investigation in the field. But these elements, although accentuating the wrong, are not the essence of it. It is something more than the advantage of celebrity of which complainant is being deprived." 248 U.S. at page 242, 39 S.Ct. at page 73. This case must be interpreted in the light of specific facts. The court there held that, because the happening of an event *in itself* does not constitute news, unless someone deems it of sufficient importance to make a news story out of it,—the gathering of the news, the discovery of the fact and its presentation in a specific form, as a news story, constitutes a *quasi* property right which the court should recognize against another agency, which, after seeing this story in print, appropriates it and rewrites it in its own way.

Subsequent cases relating to news have emphasized the fact that it is *the discovery,* and especially *the manner of presentation of a news item,* which is the essence of the right which the courts will protect.

In Chicago Record-Herald v. Tribune Ass'n, 7 Cir., 1921, 275 F. 797, 798, Judge Alschuler, speaking for the court said:

"It is true that news as such is not the subject of copyright, and so far as concerns the copyright law, whereon alone this action is based, if the Herald publication were only a statement of the news which the copyrighted article disclosed, generally speaking, the action would not lie. But, in so far as the Edwards article involves authorship and literary quality and style, apart from the bare recital of the facts or statement of news, it is protected by the copyright law. * * *

"This is plainly more than a mere chronicle of facts or news. *It reveals a peculiar power of portrayal, and a felicity of wording and phrasing, well calculated to seize and hold the interest of the reader, which is quite beyond and apart from the mere setting forth of the facts. But if the whole of it were considered as stating news or*

facts, yet the arrangement and manner of statement plainly discloses a distinct * * * flavor and individuality of expression peculiar to authorship, bringing the article clearly within the purview and protection of the Copyright Law." (Emphasis added.)

While the case just cited was not based upon unfair competition, it is my view that before a musical arrangement may be protected as a right against a competitor, it must have a distinctive characteristic, aside from the composition itself, of such character that any person hearing it played would become aware of the distinctiveness of the arrangement. I do not believe that the Supreme Court intended the decision in International News Service v. Associated Press, supra, to apply to appropriations of a different character. The limitation which other courts have placed upon the case, confining it to news-gathering only, accords with my own interpretation. See, Cheney Bros. v. Doris Silk Corporation, 2 Cir., 1929, 35 F.2d 279; R.C.A. Mfg. Co., Inc., v. Whiteman, 2 Cir., 1940, 114 F.2d 86.

In order to hold that mere appropriation of a manner of musical arrangement, which does not have a distinct entity as an individual creation, is sufficient, we would have to disregard many principles of law, which the courts have applied to cases of this character. One of these is the principle that mere portrayal of a character by an actor in a play, which is the creation of another, is not, of itself, an independent creation. The only circumstances under which the impersonation of a character can be held to create a property right is when the actor has created a "type" which, over a long period of years, has become associated with him. In Chaplin v. Amador, 1928, 93 Cal.App. 358, 269 P. 544, the court found that Charles S. Chaplin had created and perfected a peculiar type of character on the motion picture screen: "In this character, [he wore] a kind of attire peculiar and individual to himself, consisting of a particular kind or type of

mustache, old and threadbare hat, clothes, and shoes, a decrepit derby, ill-fitting vest, tight-fitting coat, and trousers and shoes much too large for him, and with this attire, a flexible cane usually carried, swung, and bent as he performs his part." 93 Cal.App. at page 360, 269 P. at page 545. When another actor sought to not only imitate the character, but to appropriate the name by calling himself "Charles Aplin", the Supreme Court of California recognized Chaplin's rights and enjoined appropriation and imitation, saying: "The question of monopoly is in no way involved in this action. Plaintiff is not seeking to prevent the appellant, Charles Amador, from appearing in motion pictures, but only seeks to prevent him from imitating the plaintiff in such a way as to deceive the public and work a fraud upon the public and plaintiff. The case of plaintiff does not depend on his right to the exclusive use of the role, garb, and mannerisms, etc.; it is based upon fraud and deception. The right of action in such a case arises from the fraudulent purpose and conduct of appellant and injury caused to the plaintiff thereby, and the deception to the public, and it exists independently of the law regulating trade-marks, or of the ownership of such trade-marks or trade-names by plaintiff. It is plaintiff's right to be protected against those who would injure him by fraudulent means—that is, by counterfeiting his role—or, in other words, plaintiff has the right to be protected against 'unfair competition in business.' " 93 Cal. App., at page 362, 269 P. at page 546. (Emphasis court's.) [1]

I do not think that a mere recording of an arrangement of a musical composition by one who is not the author of the composition is a property right which should be given recognition in equity. It is quite apparent from the rule of the Patent Office, to which I referred, that in their interpretation of the copyright act, no recognition of the right of arrangement is given to anyone except the author. We have a saying in trademark law that

---

[1] Among the cases cited by the Court as authority for this statement is International News Service v. Associated Press supra.

trade names do not exist *in vacuo.* Trade names are not names which can be claimed without their being attached to a particular business. See, Brooks Bros. v. Brooks Clothing of California, D.C.Cal. 1945, 60 F.Supp. 446, 449, and cases in Note 12. And it is evident from a study of the copyright law, that the Congress did not intend to give recognition to the right of arrangement, dissociated from the work *itself,* to which the author claims the right. Otherwise, a right could be segmentized and portions of it could be asserted by persons who do not claim *direct* ownership of a musical composition, but merely certain *subsidiary* rights. To recognize such right would not aid the owner. For the owner would be confronted with the situation of having given to a person a limited right, —the right to reproduce a musical composition,—would find himself confronted with persons who claim derivative rights from the concern to which he gave the right to reproduce this in a recording, asserting rights against *others to whom he has given similar rights.*

There is a line of cases which holds that what we may call generically by the French word *représentation,*—which means to perform, act, impersonate, characterize, and is broader than the corresponding English word,—is not copyrightable or subject to any right recognized under the law of unfair competition. So the choice of a distinct locale for a play or story is not the subject of appropriation. Nor are mechanical devices used in production, gestures or motions of actors, or the movement of a dance or a spectacle. See, Amdur on Copyright Law and Practice, pp. 720-725; 732-732; Harold Lloyd Corp. v. Witwer, 9 Cir., 1933, 65 F.2d 1, 22; Echevarria v. Warner Bros., D.C.Cal.1935, 12 F.Supp. 633; Schwarz v. Universal, D.C.Cal.1949, 85 F.Supp. 270; Seltzer v. Sunbrock, D.C. Cal.1938, 22 F.Supp. 621; Martinetti v. Maguire, C.C.Cal.1867, 16 Fed.Cas. page 920, No. 9,173.

If recognition were given to the right of ownership in a musical arrangement, we would have to disregard all these cases. We would have to hold that Mr. Charles Laughton, for instance, could claim the right to forbid anyone else from imitating his creative mannerisms in his famous characterization of Henry VIII, or Sir Laurence Olivier could prohibit anyone else from adopting some of the innovations which he brought to the performance of Hamlet.

## II. Uniqueness and Tendency to Confound

██ However, even if we grant, for the sake of argument, that such a right may exist, it must,—to be recognizable in equity, —satisfy the requirements which the courts have laid down in the cases referred to as to dramatic compositions or characterizations,—namely, *it must consist of unique elements which combine to produce a finished product which has a being or distinctive existence of its own.* Unless the product has such character, it does not create any property right which a court of equity is bound to protect. Otherwise put, the creation must be of such character as would satisfy the law of unfair competition when applied to trade names of secondary meaning. This principle is summed up in one sentence in Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73: "It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer."

The best statement of law as applied today is found in Restatement of Torts, Sec. 728: Comment a: "The ultimate test of whether or not there is a confusing similarity between a designation and a trade-mark or trade name which it is alleged to infringe is the effect in the market in which they are used. In some cases, the probable effect can be determined by a mere comparison of the designation with the trade-mark or trade name. In other cases, extrinsic evidence may be necessary. In any event, the issue is whether an appreciable number of prospective purchasers of the goods or services in connection with which the designation and the trade-mark or trade name are used are likely to regard them as indicating the same sources.

That a few particularly undiscerning prospective purchasers might be so misled is not enough. On the other hand, it is enough that an appreciable number of purchasers are likely to be so misled, even though by exercising greater discernment they could avoid the error. The issue of confusing similarity is an issue of fact as to the probable or actual reactions of purchasers." The rule applies to all cases of unfair competition, whether they involve hard goods or groceries or products of intellect.

In McGraw-Hill Pub. Co., Inc., v. American Aviation Associates, Inc., 1940, 73 U.S.App.D.C. 131, 117 F.2d 293, 295, the present Chief Justice of the United States, who was then an Associate Justice of that court, stated the principle in this manner: "Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification." Judge Minton, at present on the Supreme Court, while on the Court of Appeals of the Seventh Circuit, and speaking for that court, in Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 1943, C.A. 7, 133 F.2d 266, 270, laid this down as the rule: "Since there was no actual 'palming off' by the defendant, or evidence that it knowingly did anything to induce or assist another to do so, there can be no unfair competition unless the plaintiff has clearly established that its table had acquired in the trade a secondary meaning, in which event the mere copying may be unfair competition. To establish secondary meaning, the article itself must be so clearly identified with its source that its supply from any other source is clearly calculated to deceive the public and lead it to purchase the foods of one for that of another. Sinko v. Snow-Craggs Corp., 7 Cir., 105 F.2d 450. To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation. 'That is the article I want because I know its source,' and not the negative inquiry as to, 'Who makes that article?' In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it."

In P. Lorillard Co. v. Peper, 8 Cir., 1898, 86 F. 956, 960, Mr. Justice Brewer, sitting at the Circuit, pointed to the fact that sporadic instances of confusion are not sufficient. He said that they may be traced to "careless persons" or persons "not particularly attentive", adding, "Such things will happen in the ordinary course of business, no matter how great the differences."

[6] Except for the testimony of one interested witness, (Leroy White), offered by the plaintiff, there is no evidence in the record that any confusion of source resulted from the two recordings. The Decca record is distinctly labelled under their own label with the name of a different artist, Evelyn Knight. All the Decca advertisements in trade papers, trade sheets and other advertising media sent by Decca to distributors for display, are distinctly their own. One examining them can find no trace of copying or imitation. And they are the chief materials, *other than the contents of the recordings themselves,* from which the likelihood of confusion would arise, if any were possible. And they show a complete absence of any of the indicia of deception. To the contrary, they indicate a most meticulous observance of all rules of decent merchandising. Clearly, Decca is *flying its own banner.*

## III. The Decca Recording Is Distinctive

We come now to the recorded arrangements themselves, which, in the last analysis, must spell unfair appropriation, if any exists.

On behalf of the plaintiff, the same interested witness testified that the similarity between the two recordings is so noticeable that the playing of them gave him the impression that they were the same record. But the witness admitted that his conclusion was based upon *a minute analysis* of the two records. I quote from the record:

"The Witness: After listening to the record I know there are spots that are different, as I explained.

"The Court: In other words, both your similarities and dissimilarities are based upon hearing?

"The Witness: Yes.

"The Court: Of course, in talking of records that is what it would have to be based on.

"The Witness: That is right, sir.

"The Court: You cannot take a record and analyze the scratches, as you would a piece of music. With a piece of music, a man that can read music could tell the difference, as would also apply in a foreign language.

"The Witness: That is what I had to go on.

"The Court: What is the answer to the question? You based your statement upon your auditory sense, or something else?

"The Witness: From listening.

"The Court: Purely from listening?

"The Court: All right. That is influenced also by the fact you claim originality for that arrangement, is that true?

"The Witness: Yes.

"The Court: You could not tell whether another person, an untrained person, by listening to the two could say that is the same as the Decca record or not, could you?

"The Witness: No.

"The Court: In other words, if another person heard it, we would have to have him draw the similarity. He would have to hear them, is that not true?

"The Witness: That is right, yes.

We must bear in mind at all times that, of necessity, similarity stems from the fact that we are dealing with two recordings of *the same song*. This was made very plain when there was played to the Court, on two occasions, a recording of the music as written, without any arrangement. Any attempt to discern similarities and dissimilarities must take this into consideration. The only similarities claimed are an introduction, overlaps and handclapping, choral responses,[2] a certain verbal deviation from the wording of the song, and the introduction of those bars of music at about the middle of the song (a fill-in, as it is called), of a type which would occur to any arranger, a kind of *musique à faire*. They accentuate the beat and rhythm of the song as a background to the vocal rendition of the lyrics by the singer. The use of every one of these elements is well known in the art. No claim of originality can be based on their use, singly or in combination. The introduction of additional bars of music, additional notes in the recording of a song, as a part of its interpretation, is a practice to which probably every known singer resorts. It gives individuality to the particular interpretation of the song.

It is also quite evident in any recording against an orchestral background that an introduction would be in order. And there is testimony in the record showing that very few recordings begin with the mere singing of the song. There is also evidence

2. The interweaving of voices and imitative responses are akin to the characteristics of "the round", of which the earliest example in the English-speaking world dates to the 13th century, the famous "Sumer is icumen in." In Thomas Mann's "Dr. Faustus", there is a very charming description of such round sung by German young people, in which the spoken lines are alternated with the imitative sounds of bells: "The melodic components presented themselves in different layers, but no jangle or confusion ensued, for the imitation of the first phrase by the second singer fitted itself very pleasantly point for point to the continuation sung by the first. For if this first part—in the case of the piece, *O, wie wohl ist mir am Abend*—had reached the repeated '*Glocken lauten*' and begun the illustrative 'Ding-dang-dong', it now formed the bass not only to '*Wenn zur Ruh*', which the second voice was just then singing, but also to the beginning '*O wie wohl*', with which, consequent, on a fresh nudge in the ribs, the third singer entered, only to be relieved, when he had reached the second stage of the melody, by the first starting again at the beginning, having surrendered to the second, as the fundamental bass the descriptive 'Ding-dang-dong',—and so on." P. 289. The introduction divided into six measures is: g-a/g-e-c-d/e/e-d-d/c/c/. The addition (the fill-in) in the middle of the song, divided into three measures is: e-d sharp-e-d sharp-d sharp/e-e-f-a-a/a/.

in the record that handclapping and responses are commonly resorted to in the recording.[3]

The method has been resorted to repeatedly in interpretating popular songs, —especially in the last few years. There is testimony in the record designating compositions by well-known singers and artists in which all these elements were present. There are also present certain expressions which have been referred to as jive expressions, such as *yeah, dog, solid* and the like, which are not called for in the song as written.

■ Ultimately, the Judge, rather than attempting to resolve the different interpretations by musically trained listeners, must determine the question by placing himself in the position of the average person who would listen to the two records and determine whether such person, listening to one, would confound it with the other, or, to put it the other way, whether, in the mind of such person, there would be such confusion. It is more difficult to analyze two songs and compare them than two pieces of literature. But it is not impossible. However, it can be done. In the first place, the entire impression of the two recordings is different. The melody is the same. But the plaintiff has no rights to the melody. And the impression one gets from the recorded melodies is entirely different. The effect of the plaintiff's recording is thin, mechanical, lacking inspiration, containing just the usual accompaniments and the usual intonations which one would find in any common recording.

The impression one receives from the Decca recording is entirely different. It is rich, against a musically colorful background. It sounds full, meaty, polished. The difference derives from the different quality of the voices of the artists, the more precise, complex and better organized orchestral background, the fuller harmonization of the responses, the clearer intonation and expression, and the more musical entrances in the Decca record.

There is also a difference in the manner in which the records end. The Supreme record ends upon a male voice saying in half humorous tone, "Love that little bird." This is an anti-climax. The ending of the Decca recording is upon notes in keeping with the harmony, and not upon a prosaic statement of that type. So that even if we disregard entirely the statement of defendant's expert that the recording of the two is different in style, that the Supreme record is clearly identified as "a race or blues and rhythm" recording, while the Decca record is "popular", the result,—regardless of the method used,—the impression to the ear is entirely different. I doubt that anyone is likely to say, upon hearing the Decca record, "That is the Supreme recording". For it has so many incidences, so many qualities which are absent from the other recording that even the most untrained ear would conclude that the only similarity discernible is that which comes from the identity of the melody.

■ To conclude, therefore: Assuming that a common-law property right may be asserted to the arrangement in a record-

---

3. Musical or dramatic responses are of great antiquity. They can be traced to the antiphon in the Greek Chorus. And the attempt is presumptuous indeed to claim originality for it, either as copyrighted material or under the law of unfair competition. Judge Jenney, in Seltzer v. Sunbrock, D.C.1938, 22 F.Supp. 621, 631, gave complete answer to a somewhat similar claim: "Where plaintiffs' contention to prevail in this case, might not the author of a copyrighted novel, containing a vivid and colorful description of one of the earlier football games, enjoin any future student body from employing the customary devices and patterns of the modern rooting section. As every enthusiast knows, the waving pom-poms, * * * the intermission stunts, and in fact most of the much cherished atmosphere of college football has been associated with regattas, folk festivals, and outdoor sports since time immemorial. And does not the 'brek-ek-ek-ex, co-ax, co-ax' of the college yell date back at least to the antiphonal chant of Aristophanes' Frogs? Plaintiffs' sources are just as obvious, and his originality almost as questionable, as would be that of such a football-minded novelist."

ed song, distinct from the right to the song itself, in order that a particular arrangement be given recognition as such, the elements which the recorder has introduced must involve creative ability of a distinct kind.[4] Adding certain incidents, such as emphasis upon accent, which is all that the clapping does, does nothing to the essence of musical creation. Musical creation consists in the grouping of notes, similarity of bars, harmony or melody. See, Hirsch v. Paramount Pictures, D.C.Cal.1937, 17 F. Supp. 816, 818. Accent is important. But accent alone does not rise to the dignity of creation.

I am also convinced from the evidence in this case that the facts in the case do not show any actual confusion or any confusion likely to arise from the two recordings.

Judgment will, therefore, be for the defendants.

### Appendix

For convenience of comparison, we attach text of Exhibit 1 (Lead sheet from which plaintiff's recording was made), Exhibit 8 (the song as written), and Exhibit B(1) and (2) (portions of orchestral lead sheet from which the defendant's recording was made).

4. If we apply to the problem the rule of patent law, i. e., that in order that a combination of old elements amount to invention, it must achieve a better or different result, see, Pointer v. Six-Wheel Corporation, 9 Cir., 1949, 177 F.2d 153, the conclusion is inevitable that the combination of these elements did not produce any distinct result in this case.

So there are many instances in law where, although the Court is confronted with the misappropriation of another person's property, we cannot grant relief, because we cannot create a right where none exists.

The facts in this case show only that the particular (Supreme) recording of the song was called to the attention of the defendant and that the defendant, at first, sought to buy the plaintiff's recording. Then, for an undisclosed reason, they changed their mind and, by arrangement with the agent of the composer of the song, made a recording of their own. Their liability is to be determined not by the circumstances under which they came to know of the existence of this recorded song, but by the criterion which I have discussed in the opinion,

i. e., whether, in what they did, they violated any right of the plaintiff. My conclusion is that they did not. The language of Judge Learned Hand in Cheney Bros. v. Doris Silk Corporation, 2 Cir., 1929, 35 F.2d 279, 280, is very appropriate: "A man whose designs come to harvest in two years, or in five, has prima facie as good right to protection as one who deals only in annuals. Nor could we consistently stop at designs; processes, machines, and secrets have an equal claim. The upshot must be that, whenever any one has contrived any of these, others may be forbidden to copy it. That is not the law. In the absence of some recognized right at common law, or under the statutes * * * a man's property is limited to the chattels which embody his invention. Others may imitate these at their pleasure."

In these days of swift communication, the product of our intellectual activities may become known to others very rapidly. But unless their reproduction is such as to deprive the owner of some proprietary right, the law cannot interfere.

914

# A·LITTLE·BIRD·TOLD·ME

By Harvey O. Brooks
A.S.C.A.P.

Key C
Mod. Slow

A Lit-tle Bird — told me that you love me ——— and I—— be-lieve—

That you do,——— this lit-tle bird al-so told me I was fall-ing.——

fall-ing for no— one but you,——— there's no— use de-ny-

—ing —— I might as well con-fess —— of all the ☐ I know dear,—I'm

Harvey O. Brook,
2246 W. 27th St.
Los Angeles 7, Cal., Republic 6482

copyright secured

This number can be cleared
For Broadcasting
By A.S.C.A.P.

sure I love you best, A Lit-tle Bird—Told me I'd be hap-py———— and
I—— be-lieve—— that it's true.———— A Lit-tle Bird—told me I'll be mar-
ried———— and I—— be-lieve—that it's true———— this lit-tle
bird—al-so told me when we mar-ry———— we'll have a pret-ty cot-tage not too far————

2nd time—To Coda

2nd Chorus

"A·Little·Bird"

A-Little-Bird"

(Exhibit 8)

# A LITTLE BIRD TOLD ME

By Harvey O. Brooks
A.S.C.A.P

**Mod. Slow**

A Lit-tle Bird— told me that you love me———— and I——— be-lieve—

—that you do,——— this lit-tle bird al-so told me I was fall-ing.——

——fall-ing for no— one but you,——— there's no— use de-ny—

—ing—— I might as well con-fess—— of all the {girls/boys} I know dear;—I'm

Bourne Inc.,
799 Seventh Ave., N.Y.C.

sure I love you best, A Lit-tle Bird—Told me we'd be hap-py————and

I——be-lieve——that its true.——— A Lit-tle—Bird—told me we'll be mar-

—ried————and I—— be-lieve—that its true————this lit-tle

bird—al-so told me when we mar-ry———— we'll have a pret-ty cot-tage not too far——

"A-Little-Bird"

"A-Little-Bird"

Piano — A Little Bird Told Me

922

ESCHIRMERS
ROYAL BRAND

A Little Bird Told Me Exhibit B(2)

Lead    *A Little Bird Told Me*  Exhibit B(2)

G. SCHIRMER
ROYAL BRAND