## WHITE v. KIMMELL et al.
### Civ. A. No. 11540-Y.

United States District Court
S. D. California, Central Division.
Dec. 6, 1950.

Schauer, Ryon & McMahon, Thomas M. Mullen, Santa Barbara, Cal., for the plaintiff.

Leslie F. Kimmell, Laguna Beach, Cal., for the defendants.

YANKWICH, District Judge.

Stewart Edward White,—to whom we shall refer as "White",—as distinguished from the plaintiff, who will be referred to as such or as "the brother",—was a successful writer of books on ethics and philosophy of a popular nature. Prior to his death in 1947, at Burlingame, California, he published, through well-known publishers, books with the titles: "The Unobstructed Universe", "With Folded Wings", "The Stars Are Still There", "Anchors To Windward", "The Road I Know", "Across The Unknown", "The Betty Book". After his death, E. P. Dutton & Company published, in 1948, another book entitled, "The Job Of Living", with the copyright in the name of the defendant, Susan Kimmell. This book embodied some communications from the spirit world which White claimed to have received chiefly through his wife, Betty, from a personality referred to as "Gaelic". In the book[1], White identified

1. Stewart Edward White, The Job of Living, 1948, p. 22.

504

"Gaelic" as his and his wife's "nickname for what seemed to us a single and definite personality, apparently detailed to tell us what made the wheels go round. The material that came through Betty at that time, by and large, was inspiration, stimulus to growth and expression, with only enough explanation as to mechanics to give direction. Through 'Gaelic' our intellectual curiosities were given a certain satisfaction, on the principle that a reasonable measure of knowledge is a buttress to faith. These sessions were rare, and seemed to come only at times when one or another of a certain few people were present and in mental quandary."

The material so received was, during his lifetime, reduced to manuscript form by various reproduction processes and designated as the "Gaelic manuscript", which purported to give the communications by "Gaelic" with added comments by White. "The Job Of Living" contained portions of the manuscript.

On October 20, 1944, White executed a Bill of Sale transferring to the defendant Kimmell all his right and title to certain designated works, including the old and new "Gaelic manuscripts", "with the right to publish or otherwise use said manuscripts, in any way which she in her sole judgment shall determine".

The plaintiff, White's brother and a resident of Santa Barbara, California, in a complaint for declaratory judgment [2], seeks a declaration that both manuscripts, "Gaelic" and "old Gaelic", are in the public domain and may be quoted without infringement either of the copyright claimed by the defendant Kimmell on "The Job Of Living", or the common-law proprietary rights claimed under the bill of sale. This is resisted by the defendant Kimmell, who asserts that she is the owner of the manuscript and the material contained therein, whether published or unpublished. She seeks a declaration to that effect, and an injunction prohibiting the plaintiff from using any portion of the manuscript of "old Gaelic" or "Gaelic" or "The Job Of Living". The plaintiff's claim is bottomed upon the contention that, in his lifetime, and prior to the execution of the bill of sale in 1944, and to the publication of "The Job Of Living," White allowed the unrestricted publication of the material and it is now in the public domain.

## I. The Meaning of "Publication"

The pleadings are broad enough to cover the rights to both the unpublished portions of the manuscript and "The Job Of Living". The declarations sought by both parties would cover all the material, either published or not. In truth, however, what plaintiff seeks, *not by reason of his relationship to White*, but as a member of the public, is the right to reproduce the unpublished portion of the "Gaelic manuscript".

As the unpublished material is not copyrighted, the question of ownership must be determined by common-law principles. The common law has long recognized a property right in the products of man's creative mind, regardless of the form in which they took expression. For this reason, literary compositions and philosophical speculations, whether they are presented as the original work of the author or are claimed to have been transmitted to him through one of the many forms of inspiration that have come to be recognized as the source of intellectual production, are treated as a kind of property.[3] And the author has property in his manuscript which will

---

2. 18 U.S.C.A. §§ 2201, 2202.

3. 18 C.J.S., Copyright and Literary Property, §§ 4–10; Amdur, Copyright Law and Practice, 1936, pp. 30–31; California Civil Code, Sec. 980. And see: Wheaton v. Peters, 1834, 8 Pet. 591, 657–658, 8 L.Ed. 1055; Bobbs-Merrill Co. v. Straus, 1908, 210 U.S. 339, 346, 28 S.Ct. 722, 52 L.Ed. 1086; Moore v. Ford Motor Co., 2 Cir., 1930, 43 F.2d 685, 686; Echevarria v. Warner Bros. Pictures, Inc., D.C.Cal.1936, 12 F.Supp. 632, 634;

Supreme Records, Inc., v. Decca Records, D.C.1950, 90 F.Supp. 904, 906; Loew's, Inc., v. Superior Court, 1941, 18 Cal.2d 419, 421, 115 P.2d 983; Yadkoe v. Fields, 1944, 66 Cal.App.2d 150, 160, 151 P.2d 906; Johnston v. Twentieth Century Fox Film Corporation, 1947, 82 Cal.App.2d 796, 807–808, 187 P.2d 474.

Our Court of Appeals has summed up the principle in one brief sentence: "Literary property *is not distinguished from other personal property and is subject to*

be protected by the courts against anyone who seeks to deprive him of it, either by securing an unauthorized copy of it or by publishing it. The right exists until the author permits a general publication.[4] The following language of the Supreme Court is a pithy summary of the principles just adverted to: *"At common law, the exclusive right to copy existed in the author until he permitted a general publication. Thus, when a book was published in print, the owner's common-law right was lost. At common law an author had a property in his manuscript, and might have an action against any one who undertook to publish it without authority".*[5] (Emphasis added.)

What constitutes general publication has given the courts much concern. The Supreme Court has adopted as its own the following criterion for determining the matter: "It is a fundamental rule that to constitute publication there must be such a dissemination of the work of art itself among the public as to justify the belief that it took place with the intention of rendering such work common property." [6]

 The publication, to be effective as a dedication, must be *a general publication.* A limited publication which communicates the contents of a manuscript to a definite group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale, is considered a "limited publication", which *does not* result in loss of the author's common-law right to his manuscript.[7]

An early American case contains a very clear statement of the conditions which render a publication limited in nature: "The distinction between a public circulation of written copies, and a restricted or private communication of their contents, was, for some purposes, recognized before the use of printing. * * * But, except under special and unusual circumstances, an author who then parted with a manuscript copy gave to it the most public circulation of which it was capable. *Now, the parting by an author with manuscript copies of his unprinted composition is ordinarily regarded as an act of mere private circulation.* * * * Printed copies also may be circulated privately. Their circulation is thus private when they are delivered to a few ascertained person only, who receive them under conditions expressly or impliedly precluding any ulterior diffusion of the knowledge of their contents. Such a case occurs when a small first edition of a book, printed with a notice on the title page that it is for private circulation, is gratuitously distributed by the author among particular persons. Mr. Justice Talfourd, when at the bar, issued in this manner the first impressions of his tragedy of Ion. Here the restriction was expressly defined. *It may, in other cases, be implied from the selection of the persons, and from*

---

*the same rules and is likewise protected".* (Emphasis added.) Universal Pictures Co. v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354, 364.

See, Note, Literary Property, 1950, 38 Cal.Law Rev. 33; Comment, Common Law Copyright, 1950, 24 So.Cal.Law Rev. 65.

4. Bartlett v. Crittenden, C.C.Ohio, 1849, 2 Fed.Cas. page 967, No. 1076; Press Publishing Co. v. Monroe, 2 Cir.1896, 73 F. 196, 199; Caliga v. Inter Ocean Newspaper Co., 1909, 215 U.S. 182, 188, 30 S.Ct. 38, 39, 54 L.Ed. 150; Moore v. Ford Motor Co., supra, 43 F.2d at page 686; Nutt v. National Institute, etc., 2 Cir.1929, 31 F.2d 236, 238.

5. Caliga v. Inter Ocean Newspaper, 1909, 215 U.S. 182, 188, 30 S.Ct. 38, 39, 54 L. Ed. 150.

6. American Tobacco Co. v. Werckmeister, 1907, 207 U.S. 284, 299–300, 28 S.Ct. 72, 77, 52 L.Ed. 208, quoting, *with approval,* Slater on the Law of Copyright and Trademark, p. 92.

7. Abernethy v. Hutchinson, 1824, 3 L.J. Ch. Reports 209; Prince Albert v. Strange, 1849, 2 De Gex & S.M., 652, 41 Eng.Rep. (Reprint) 1171; Prince Albert v. Strange, 1849, 1 Mc. & G. 25, 64 Eng.Rep. (Reprint) 293; Werckmeister v. American Lithographic Co., 2 Cir. 1904, 134 F. 321, 325, 68 L.R.A. 591; Jewelers' Mercantile Agency v. Jewelers' Weekly Publishing Co., 1898, 155 N.Y. 241, 49 N.E. 872, 41 L.R.A. 846; Kurfiss v. Cowherd, 1938, 233 Mo.App. 397, 121 S.W.2d 282; Waring v. WDAS Broadcasting Co., 1937, 327 Pa. 433, 194 A. 631; Berry v. Hoffman, 1937, 125 Pa.Super. 261, 189 A. 516.

*the method or attendant circumstances of the delivery. * * * The circulation must be restricted both as to persons and purpose, or it cannot be called private."* [8] (Emphasis added.)

One of the older authorities on the law of property in intellectual productions has summed up the rights of the author of an unpublished book in this manner:[9] "He has a right to exclude all persons from its enjoyment; and, when he chooses to do so, any use of the property without his consent is a violation of his rights. He may admit one or more persons to its use, to the exclusion of all others; and, in doing so, he may restrict the uses which shall be made of it. He may give a copy of his manuscript to another person, without parting with his literary property in it. *He may circulate copies among his friends, for their own personal enjoyment, without giving them or others the right to publish such copies.*" (Emphasis added.)

From this, it is evident that, in determining whether a publication is general or special, the test is "whether there is or is not such a surrender as permits the absolute and unqualified enjoyment of the subject-matter by the public or the members thereof to whom it may be committed."[10]

The case from which the foregoing quotation is taken epitomizes the law on the subject: "A general publication consists in such a disclosure, communication, circulation, exhibition, or distribution of the subject of copyright, tendered or given to one or more members of the general public, as implies an abandonment of the right of copyright or its dedication to the public. Prior to such publication, a person entitled to copyright may restrict the use or enjoyment of such subject to definitely selected individuals or a limited, ascertained class, or he may expressly or by implication confine the enjoyment of such subject to some occasion or definite purpose. A publication under such restrictions is a limited publication, and no rights inconsistent with or adverse to such restrictions are surrendered. Restrictions imposed upon the use prior to publication protect the copyright. Such restrictions imposed after publication cannot affect the public rights acquired by reason of the fact of publication. *The nature of the subject-matter, the character of the communication, circulation, or exhibition, and the nature of the rights secured, are chiefly determinative of the question of publication.*"[11] (Emphasis added.)

Implicit in these rulings is the thought that if the circumstances show an intent to communicate the contents of the manuscript to a designated group and for a specified purpose, and does not extend to the public at large, the publication is limited. For this reason, the private circulation of an original manuscript or copies of it "is not a publication, unless it amounts to a general offer to the public."[12]

Limited publication, as defined by these authorities, is, in its effect, no more than the exhibition of a painting, the representation of a play, or the giving of a lecture,—none of which destroys the right of common-law ownership or confers the right to unrestricted reproduction or circulation.

## II. Limited Publication

Tested by the principles just referred to, the evidence in this case shows no intention to dedicate any portion of the "Gaelic" manuscripts to the public. And this conclusion may be drawn from the evidence offered on behalf of the plaintiff, which consisted of his own testimony, that of

8. Keene v. Wheatley, C.C.Pa., 14 Fed. Cas. pages 180, 191, No. 7644.

9. Eaton S. Drone, A Treatise on the Law of Property in Intellectual Products, 1879, pp. 102–104. This test has been repeatedly cited with approval by the courts. And see, Bobbs-Merrill Co. v. Straus, supra, 210 U.S. 339, 28 S.Ct.

722; Werckmeister v. American Lith. Co., supra, 134 F. at page 324.

10. Werckmeister v. American Lith. Co., supra, 134 F. at page 325.

11. Werckmeister v. American Lith. Co., supra, 134 F. at page 326.

12. Werckmeister v. American Lith. Co., supra, 134 F. at page 325.

*White's* former secretary, W. N. Maguire, and the depositions of Margaret Oettinger and Harriet W. Jones.

The plaintiff and the former secretary testified generally that in 1933 and 1934, copies of the manuscripts, made by what was referred to as the "ditto process", were sent out from White's office to certain persons interested in the ideas which White had believed in, and which he had made popular through his books. But they admitted that the persons to whom the copies were sent were persons whose names had been sent in by *friends or were interested in the ideas* or belonged *to the small elite* who were studying them. *No copy was ever placed in a public library, a reading room or on the shelf of a book store or club, where it was made accessible to anyone who wished to look at it. Nor were any copies offered for sale.* Mrs. Oettinger was permitted to make a copy for herself, and she stated, in her deposition, that in 1941, she distributed some thirty copies. But it was evident from her own testimony that in her discussion with White, she had referred to the fact that she wished to make copies "for two or three people". Whereupon, he suggested that he knew other people who might want them, and so he authorized her to make the copies. As she was not a woman of means, he authorized her to charge such persons as were referred to her two dollars for the cost of mimeographing. Her testimony in this respect is very revealing:

"Q. And was there any statements at that time made with respect to where you would sell or distribute the manuscripts which you made, or the copies which you made? A. No. I hadn't had very much experience with it at that time, and *I knew of two or three people* who wanted copies and that is all I knew about it, *that two or three people wanted copies, and he said he knew several people who would like to have copies, and he gave me from time to time the names of people who would like to have copies of this manuscript. Several of the copies I disposed of were sent to people whose names were given to me by Mr. White.*

"Q. Did you have a copy of the manuscript before you went to see Mr. White? A. Yes. I had borrowed a copy from Mrs.—Dr. Benner, I can't think of her name was—Katherine Benner.

"Q. Did she have several copies? A. I think she only had one. She might have— I don't know whether she had more than one or not."[13]

While the witness sought to give the impression that she was given *carte blanche* to reproduce and distribute at will, the excerpt just quoted shows strictly the limitations which were imposed. Her own testimony and the testimony of others show that any of the names sent to her were selected by others, including the defendant. Mrs. Harriet White's deposition stated that White had told her that he had given Mrs. Oettinger permission to "pass out" the material and that she secured two or three copies for two dollars each. Despite the attempt of this witness to prove permission "to sell", the pattern which emerges is that of a selected group of persons recommended either by White or the others who were interested in the philosophical or ethical principles that he was preaching, who were given access to the manuscript. These are distinguishing marks of *private* distribution.

### III. The "Gaelic" Manuscripts Are Not in Public Domain

The New York Court of Appeals, in a case which has already been cited, while holding that the facts in the particular case showed a general publication, laid down the indicia of private distribution, in language which is very appropriate to the discussion here: "* * * if a book be offered gratuitously to the general public, it will constitute publication. This may be done by presenting it to public libraries, and this is so because the author or publisher, by that act, puts it in such a place that all the public may see it if they choose. The reason why exposing for sale or offering gratuitously

13. Deposition of Margaret Oettinger, Plaintiff's Exhibit No. 4, pp. 5, 6.

508

to the general public constitutes publication is stated in the last part of the rule as follows: 'So that any person may have an opportunity of enjoying that for which copyright is intended to be secured.' * * Several cases have arisen where the courts have held that the private circulation of pictures, manuscripts, or printed books did not constitute a publication, such as Prince Albert v. Strange, supra; also Bartlette v. Crittenden, 2 Fed.Cas. page 981, No. 1,082, 4 McLean, 300, where the plaintiff, a teacher of bookkeeping, for the convenience of his pupils, wrote his system of instructions on separate cards, which they were permitted to keep for their convenience. So a gratuitous circulation of copies of a work among friends and acquaintances has been held not to amount to a publication. Dr. Paley's Case, cited in 2 Ves. & B. 23, was one where a bookseller was restrained from publishing manuscripts left by Dr. Paley for the use of his own parishioners only. Coppinger, in his work on Copyright, at page 117, after considering the last case cited and others, reached the following conclusion: 'The distinction is in the limit of the circulation. *If limited to friends and acquaintances, it would not be a publication; but, if general, and not so limited, it would be.*'[14] (Emphasis added.) And the limitation which makes the publication private does not relate to numbers of persons, but to the type of persons to whom the communication is made and the purpose of making it. If limited to friends or acquaintances, or persons having a common interest in a publication, or in the ideas which it expresses, the limitation is effective, although, in reality, a large number of copies may be circulated. In a New York case, involving the question whether the distribution of reprints of a copyrighted article without an indication of the copyright was a waiver of the copyright, it appeared that thousands of reprints were distributed to the author's patients with instructions to call the article to the attention of others. Reprints were kept in the author's reception room where they could be examined or carried away by persons visiting the establishment. Nevertheless, the Court held that the copyright was not thereby lost, saying: "The primary purpose of the distribution was to give information to persons interested in the subject discussed by the articles, and to relieve Schellberg of the necessity of orally explaining his system of treatment to those who might wish to learn about it."[15]

■ So, here, the inference can be drawn, even from the testimony on behalf of the plaintiff, that the object of distribution was not to dedicate the contents of the "Gaelic" manuscript to the public, but to communicate to a few persons interested in the subject,—kindred spirits, as it were, the philosophy it taught. Indeed, the testimony showed that the manuscript originated, in part, from written answers which had been given to questions propounded by readers of White's other books. We clearly have a person who promulgates a certain philosophy and makes it possible for some of those interested in it to see its exposition, by permitting them to have for their own use a privately mimeographed copy of an unpublished manuscript. The manuscript is, therefore, the equivalent of the notes which a student makes of a lecture. The lecturer, by permitting him to make the notes and take them away, does not lose his right to later copyright the material.

■ From the very beginning of the development of this branch of the law, it has been conceded that circulation among students does not destroy the common-law right of the author. In one of the old

---

14. Jewelers' Mercantile Agency v. Jewelers' Weekly Publishing Co., supra, 49 N.E. at page 875.

15. Schellberg v. Empringham, D.C.N.Y. 1929, 36 F.2d 991, 992. This case arose under the Federal copyright law. But whether a communication takes place which amounts to a general publication is determined by principles which apply to all situations, regardless of the law under which they arise. So the reasoning of this case can be applied with great force to the facts here.

cases,[16] the Lord Chancellor made the following observations: "Now, if a professor be appointed, he is appointed for the purpose of giving information to all the students who attend him, and it is his duty to do that; but I have never yet heard that anybody could publish his lectures; nor can I conceive on what ground Sir William Blackstone had the copyright in his lectures for twenty years, if there had been such a right as that; but it never was understood that those lectures could be published;—and so with respect to any other lectures in the university, it was the duty of certain persons to give those lectures; but it never was understood that the lectures were capable of being published by any of the persons who heard them." And all those who have followed Blackstone and combined teaching with writing, whether in the field of law or others, have had the benefit of the rule.[17]

■ We add that other evidence in the record supports the conclusion that there was no general publication. As the plaintiff leans heavily on the deposition of Mrs. Oettinger, it is very significant that on the copy of the manuscript which she produced with the deposition, there was the printed legend *"Reproduced by permission of Stewart Edward White."* Such an inscription contradicts the design to publish to the world at large. For if the object be to release the material to the public, the statement of *permissive reproduction* is meaningless. Its appearance on the manuscript indicates the *limited purpose* of the permission granted. White, in reporting on November 18, 1940, to the defendant his understanding with Mrs. Oettinger, wrote: "Just a hasty note, before you do any work copying Gaelic. Yesterday afternoon some people were here from Palo Alto who are so stuck on Gaelic that they want to copy it in mimeograph. They asked (a) whether I was willing; (b) if so, would I mind their pass—it

around among such of their friends who want copies, (c) if so, again, whether I would mind their charging such people the exact cost. I approved. So, if you write them, you might get one of those copies. Name: Mrs. Frank Oettinger, RFD #1, Menlo Park, Cal."[18] This is a contemporaneous statement, and is very persuasive as to what the understanding was. In a letter dated May 18, 1945, to Mrs. Oettinger, he indicates that the right to copy did not imply the right to publish in general: "As to the Gaelic, Sue Kimmell is quite right in saying that you may go ahead at your discretion with more copies of it. And your friend, Barbara Kelkin, got the wrong impression. I have no objection whatever to the distribution of copies of Gaelic, provided, of course, *it is not in published form."*[19] White had published many books in his lifetime. So, when he spoke of reserving "publication" rights, as he did in the bill of sale and in this letter, he did not refer solely to "publication by print". He used the words in the sense in which they are used in the law of literary property, with which he was familiar. Otherwise put, he was determined that the permission granted *did not result in a general publication.*

And in a letter written on October 26, 1944, to the defendant, a few days after the bill of sale was executed, White spoke about his brother's possible attempts to assert rights to the "Gaelic Manuscripts", and gave that as his reason for protecting her against "what might be a disagreeable situation. The sort of squabble that just might arise if, after I die, he should rise and howl and attempt to do his own Gaelic, and show active resentment about an 'outsider' having the say over him, etc., etc., you can imagine as well as I."[20]

The deposition of Ivey Oenita Duce, relating to her conversation with White, offers positive proof of the fact that strict limitations were imposed upon all persons

16. Abernethy v. Hutchinson, supra, p. 215. And see, Nutt v. National Institute, etc., 2 Cir.1929, 31 F.2d 236, 238.

17. Nutt v. National Institute, etc., 2 Cir. 1929, 31 F.2d 236; Waring v. WDAS Broadcasting Co., 1937, 327 Pa. 433, 194 A. 631.

18. Defendant's Exhibit A.

19. Plaintiff's Exhibit 3.

20. Defendant's Exhibit C.

who were given the rights to copy the "Gaelic" manuscript,[21] as does also the deposition of Don E. Stevens.

These occurrences, ranging over a period of years, are not, as the brother contends, mere self-serving declarations which seek to explain *after the act,* what was done; they are a consistent series of statements showing a clear design on White's part to limit communication. It is true that, notwithstanding such design, it was still possible for those to whom permission was given to destroy the effect of limitations by unlimited general distribution.[22] But this, fortunately, did not occur. Even those who would *now* generalize the limited right they received, testify to the observance of the limitation. The most conservative estimate of the number of copies distributed does not exceed 75. And, as already appears, this distribution was to designated persons. None was made to a public institution where the public had access to it. None was sold. And the case before us comes clearly within the rule stated in Bartlett v. Crittenden [23]: "To make a gift of a copy of the manuscript is no more a transfer of the right or abandonment of it, than it would be a transfer or abandonment of an exclusive right to republish, to give the copy of a printed work. In his treatise on Equity, (section 943,) Mr. Justice Story says, 'In cases of literary, scientific, and professional treatises in manuscript, it is obvious, that the author must be deemed to possess the original ownership, and be entitled to appropriate them to such uses as he shall please. Nor can be justly be deemed to intend to part with that ownership by depositing them in the pos-

21. Defendant's Exhibit D, Deposition of Ivy Oenita Luce, from which we quote: "Q. Now, did Mr. White ever give you permission to make copies of that manuscript? A. Well, I just started explaining to you what happened. He told me I could write to this Mrs. Oettinger and get a copy from her, and I wrote to her and she informed me that she had no more copies but that she had some stencils and that they were very badly worn but that if I wished to I could make some copies from these stencils. So then, as I remember it, I wrote to Mr. White and asked him about it, and *he said to me that it was perfectly all right for me to make a few copies but they were to be limited and that I was only to allow a few of my close friends to see them, that I must be very careful, in fact, to whom I showed them, because since they had not been published anybody could, you might say, steal the material; and naturally I wanted to protect his manuscript from anything like that.* So I had these two or three friends here *who were studying like I was,* and we sent up to the lady and she sent us the stencils. And I had no mimeograph machine, and a Mrs. Cuthbert had a mimeograph machine and she turned out, as well as I can remember, *about ten copies.* I know she had to remake or recut some of the stencils, they made such bad copies. * * * "Q. And what happened to them? A. And I still have three of them. And, as I said, I have not referred to them for years, because I, myself, went into the study of mysticism, which goes far beyond occult phenomena, and I have just very occasionally read a few paragraphs of it to some of my students who might be puzzled about something. I have three copies, as well as I know, on my shelf, and Don Stevens received one and we sent one to Mr. Stewart White because he said he was out of copies at the moment. He had loaned his out and didn't have any at the moment. And I believe Mrs. Cuthbert got one and Mrs. Ahlstrand and Mrs. Simpson got one, and I think we sent one to Mrs. Oettinger. * * *

"Q. Now, those people who received copies were known to Mr. White, were they not? * * * A. He knew who they were.

"Q. He knew who they were, and you had his permission to give them a copy A. Oh, yes.

"Q. In other words, *it was not left to you to distribute* to * * * A. Oh, no, *because he had adjured me to be very careful as to who saw it, because he didn't want this material to fall into the hands of unprincipled people.*

"Q. In other words, I take it that *you were given very definite instructions that no one except selected groups or individuals could peruse that matter or even see it?* A. *Very definitely.* (Pp. 8–11.) (Emphasis added.)

22. Cf. Kurfiss v. Cowherd, 1938, 233 Mo. App. 397, 121 S.W.2d 282, 287–288; Larrowe-Loisette v. O'Loughlin, C.C.N. Y.1898, 88 F. 896.

23. Bartlett v. Crittenden, C.C.Ohio, 1849, 2 Fed.Cas. pages 967, 970, No. 1076.

session of a third person, or by allowing a third person to take and hold a copy of them. Such acts must be deemed strictly limited, in point of right, use, and effect, to the very occasions expressed or implied, and ought not to be construed as a general gift or authority for any purposes of profit or publication, to which the receiver may choose to devote them.' And he says, to prevent the publication of manuscripts, without the consent of the author, an injunction should be issued."

 The conclusion is therefore inescapable that there was no general publication of the "Gaelic" manuscript.

 The consistency with which the courts for over a century and a half have upheld an author's common-law right to his manuscript and the ardor which they have shown to protect his rights, despite limited publication, is one more indication of the healthfulness of the common-law system and the determination of the courts to use their powers, aided by equitable principles, to protect intellectual products against piracy. No reason exists why we should depart from these strict standards. In these days of quick communication of ideas, a rule which would make a limited disclosure, such as occurred in this case, synonymous with publication would deny to the creator in the intellectual field the right to the product of his creative imagination. This would be harmful to the development of ideas. For, if we encourage piracy, we discourage creative minds from sharing, in a restricted manner, their ideas before their full fruition. The policy of the law, in protecting intellectual products, is to encourage productivity.[24] A protected limited sharing may enhance it by giving additional time for a fuller development. A weakening of this right might result either in premature publication or a total with-

holding of ideas, under fear of injury to the author's ownership in them. Either would be a loss to the creative spirit, which the courts should not consciously encourage.

Judgment and declaration will, therefore, be for the defendant that the "Gaelic" manuscripts are not in the public domain, and that the defendant is their sole owner.

Injunction will issue enjoining the plaintiff from using it in any manner.

Costs, but not attorney's fees, will be allowed the defendant. See, 17 U.S. C.A. § 40; Official Aviation Guide Co., Inc., v. American Aviation Inc., Associates, 1947, 7 Cir., 162 F.2d 541, 543.

24. The American law of copyright stems from the power conferred upon the Congress by the Constitution "To promote the Progress of Science and useful Arts". Constitution of the United States, Article I, Sec. 8. And, as cases discussed in this opinion indicate, the common-law right to literary property precedes the constitutionally authorized protection and was not in any way affected by the enactment of the copyright laws, except that one availing himself of the copyright laws loses the corresponding common-law rights. See, Bobbs-Merrill Co. v. Straus, 1908, 210 U.S. 339, 346–349, 28 S.Ct. 722, 52 L.Ed. 1086; Loew's, Inc. v. Superior Court, 1941, 18 Cal.2d 419, 421–425, 115 P.2d 983.