INTERNATIONAL TAPE MANUFAC-
TURERS  ASSOCIATION,
Plaintiff,

v.

Richard GERSTEIN et al., Defendants.

No. 72–164–Civ–JE.

United States District Court,
S. D. Florida.

June 12, 1972.

James L. Fisk, Washington, D. C., for plaintiff.

William J. Dunaj, Special Asst. Atty. Gen., Miami, Fla., and Richard Sepler, Special Asst. Atty. Gen., Hialeah, Fla., for defendants.

## OPINION

LAYTON*, District Judge.

Plaintiff, an unincorporated voluntary association, has brought this class action seeking declaratory and injunctive relief from future criminal prosecutions threatened under the provisions of a Florida statute. Plaintiff alleges that such imminent prosecutions would result in the instigation of harassing and vexatious litigation and cause it irreparable harm. Defendants are the State Attorneys, who are responsible for prosecutions initiated pursuant to the challenged Florida Statute. Plaintiff contends that the Florida statute is in conflict with Federal copyright law and is, therefore, void pursuant to the Supremacy Clause of the Constitution. It seeks a permanent injunction restraining defendants from initiating any proceedings to enforce this allegedly unconstitutional section of the Florida penal code. Furthermore, it seeks a declaratory judgment that the Florida statute is unconstitutional.

Federal jurisdiction is claimed pursuant to 28 U.S.C. §§ 1338, 2201–02, 2281–84.

On March 2, 1972, this Court granted plaintiff's motion to designate this action as a class action and entered a

---

* Sitting in the United States District Court for the Southern District of Florida by assignment.

temporary restraining order against defendants, prohibiting them from enforcing the provisions of the challenged Florida Statute. Defendants have filed motions to dismiss the complaint and dissolve the order.

Plaintiff is engaged in the business of making and selling sound recordings in the form of discs and tapes. It purchases on the open market disc phonograph records and tapes which have been manufactured and sold through usual commercial channels by record companies. It then makes tape recordings of these sound recordings, and uses these tapes to manufacture additional copies of the recordings which it markets and sells, affixing to each recording a label containing the title of the original sound recording and the name of the recording artist whose performance has been copied.

The Florida statute, which became effective on October 1, 1971, makes it a criminal offense to engage in such "piracy" of sound recordings by selling the copies for profit:

"It is unlawful to:

1. Knowingly and willfully, without the consent of the owner, transfer or cause to be transferred any sounds recorded on a phonograph record, disc, wire, tape, film or other article on which sounds are recorded, with the intent to sell or cause to be sold for profit, such article on which sounds are so transferred.

2. Sell any such article with the knowledge that the sounds thereon have been so transferred without the consent of the owner.

(b) (2) As used in this section . . . 'Owner' means the person who owns the master phonograph record, master disc, master tape, master film, or other device used for reproducing sounds on phonograph records, discs, tapes, films, or other articles upon which sound is recorded, and from which the transferred recorded sounds are directly or indirectly derived." [1]

The Constitution provides that Congress has the power to grant and regulate copyrights:

"The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the ·exclusive Right to their respective Writings and Discoveries." [2]

Title 17 of the United States Code contains the statutes which Congress has enacted pursuant to its powers derived from the Constitution. Public Law 92–140 is the latest amendment to Title 17. 92–140 consists of three sections which made several changes in the provisions of Title 17.

The first change added subsection (f) to 17 U.S.C. § 1—exclusive rights as to copyrighted works—which permits only the owner of a copyrighted sound recording to reproduce it for sale:

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

(f) to reproduce and distribute to the public by sale or other transfer of ownership . . . reproductions of the copyrighted work if it be a sound recording: *Provided,* That the exclusive right of the owner of a copyright in a sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form that directly or indirectly recaptures the actual sounds fixed in the recording."

17 U.S.C. §§ 19 and 20—notice; form —were amended to prescribe the form of notice of a copyright on a published sound recording, as required by 17 U.S. C. § 10.

17 U.S.C. § 26—terms defined—was also amended:

"[A] reproduction of a [sound recording] shall be considered to be a copy thereof. 'Sound recordings' are works that result from the fixation of

---

1. Fla.Stat. ch. 71–102 § 543.041, F.S.A.

2. U.S.Const. art. I, § 8, cl. 8.

a series of musical, spoken, or other sounds. . . . 'Reproductions of sound recordings' are material objects in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be . . . reproduced . . . and include . . . discs or tapes for use in mechanical music-producing machines."

Section 2 of 92–140 added a new subsection of 17 U.S.C. § 101—infringement—which stated that unauthorized use of copyrighted sound recordings was an infringement:

"(e) [D]iscs or tapes for use in mechanical music-producing machines adapted to reproduce copyrighted musical works, shall be considered copies of the copyrighted musical works which they serve to reproduce mechanically . . . and the unauthorized manufacture, use, or sale of such interchangeable parts shall constitute an infringement of the copyrighted work rendering the infringer liable in accord with all provisions of this title dealing with infringements of copyright and, in a case of willful infringement for profit, to criminal prosecution pursuant to section 104 of this title."

Section 3 of 92–140 provided the effective dates for the provisions of the amendments to Title 17:

"This Act shall take effect four months after its enactment except that section 2 of this Act shall take effect immediately upon its enactment. The provisions of title 17, United States Code, as amended by section 1 of this Act, shall apply only to sound recordings fixed, published, and copyrighted on and after the effective date of this Act and before January 1, 1975, and nothing in title 17, United States Code, as amended by section 1 of this Act, shall be applied retroactively or be construed as affecting in any way any rights with respect to sound recordings fixed before the effective date of this Act." [3]

Prior to determining the merits of the substantive issues which plaintiff raises in the case at bar, substantial jurisdictional questions raised by defendants must be adjudicated. These challenges attack the standing of the plaintiff, the underlying federal jurisdiction, declaratory judgment jurisdiction and injunctive jurisdiction. Finally, should the first four challenges fail, defendants contend that this Court should abstain from exercising its jurisdiction.

## STANDING

The defendants argue that the plaintiff lacks standing to prosecute this action because it is not the real party in interest as defined by the Federal Rules.[4]

The Supreme Court has held that the question of standing is not related to the precise nature of the legal interests asserted by a plaintiff. A determination of the legal interests lies within the scope of a ruling on the merits of the case.[5] To demonstrate standing, a plaintiff must show that he has (1) such a personal stake in the controversy as to assure adverseness, and (2) injury or threat of injury to an arguably legally recognized, rather than a personal, interest.[6] Plaintiff has demonstrated its

---

3. 92–140 was enacted on October 15, 1971. February 15, 1972, is the date on which section 1 of 92–140 took effect. The reason for the January 1, 1975 cut-off date is "to provide a period for further consideration of various alternatives for solving the problems in this area, before resorting to permanent legislative enactment," according to House Report No. 92–487, dealing with 92–140, U.S.Code Cong. & Admin.News, p. 1567.

4. Fed.R.Civ.P. 17(a) : Every action shall be prosecuted in the name of the real party in interest.

5. Association of Data Processing Service v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

6. Flast v. Cohen, 392 U.S. 83, 99, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). See, Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) ; United

personal stake through its involvement in this and other suits. It is clearly threatened with injury by the initiation of prosecutions pursuant to the provisions of the Florida statute. Therefore, the plaintiff has standing to prosecute this action and the first contention of the defendants must be dismissed.

## UNDERLYING FEDERAL JURISDICTION

The defendants argue that there is no jurisdictional statute providing for federal jurisdiction in the case at bar.

Generally, a plaintiff in a copyright suit argues either that he is entitled to a copyright, or that a copyright which he owns has been infringed. In the case at bar, plaintiff raises neither contention. Here, defendants claim that in their absence, there is no federal jurisdiction pursuant to 28 U.S.C. § 1338,[7] and that this Court must dismiss the suit. This Court is not persuaded by defendants' reasoning.

Congress has expressed an interest in preserving for authors certain rights with respect to the control of the dissemination of their works and the rewards attained from such distribution. It also has regulated the works entitled to such protection, and the time within which those works may be protected. While not necessarily preempting the field, Congress has clearly manifested an interest extending to the entire breadth of copyright protection provided by both the federal and state systems. Under such circumstances, this Court feels that there may be an inherent jurisdiction covering the entire field of copyrights lodged in the district courts, which, while not exclusive, may permit federal courts to hear such cases as those filed by plaintiff in the instant action.[8] This result may occur even where state law governs the entire disposition of the substantive issues presented by the case.[9]

The fact that the plaintiff in the case at bar does not claim a copyright is not dispositive of whether jurisdiction is present pursuant to § 1338. Clearly, Title 17 U.S.C. §§ 1–215 is an "Act of Congress relating to . . . copyrights." § 1338 does not require that only the plaintiff allege either the validity of a copyright or the infringement of that copyright; rather, it deals with subject matter solely. Because 92–140 expressly deals with sound recordings, and specifically states that it affects no changes respecting the rights regarding sound recordings published prior to the effective date of the act, this Court must have jurisdiction to hear claims based on rights as they existed, both prior to the act and subsequent to it. Furthermore, once it is determined that this Court has jurisdiction to hear the case, then pursuant to the rule of "pendent jurisdiction," the other issues raised by the case fall within the purview of this Court.[10] Since the jurisdiction rests on § 1338 rather than § 1331, no jurisdictional amount is required.

---

Federation of Postal Clerks, AFL–CIO v. Watson, 133 U.S.App.D.C. 176, 409 F.2d 462 (1969), cert. den. Blount v. United Federation of Postal Clerks, 396 U.S. 902, 90 S.Ct. 212, 24 L.Ed.2d 178 (1969); National Motor Freight Traffic Asso. v. United States, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963).

7. 28 U.S.C. § 1338:
   "The district court shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . copyrights . . . . Such jurisdiction shall be exclusive of the courts of the states. . . ."

8. Union Pacific Ry. Co. v. Woodahl, 308 F.Supp. 1002 (D.Mont.1970).

9. Int. Brotherhood of Teamsters v. W. L. Mead, Inc., 230 F.2d 576, 580–581 (1st Cir. 1956). See, Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957).

10. Osborn v. Bank of United States, 9 Wheat. 738, 6 L.Ed. 204 (1824), was the first case to enunciate this principle. Its most recent refinement, United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), holds that pendent jurisdiction exists whenever the state and federal claims "derive from a common nucleus of operative fact" which "would ordinarily be [tried] in one judicial proceeding."

Finally, even though this issue was not argued before this Court, the Supreme Court's recent landmark decision of Lynch v. Household Finance Corp.[11] may provide for jurisdiction pursuant to 28 U.S.C. § 1343(3).[12] In that case, the Court abolished any jurisdictional distinction based on categorizing the affected right of a plaintiff as a "property" right or a "personal" right. Since the Florida statute may deprive plaintiff of property rights provided by federal copyright legislation, it would seem that this Court has jurisdiction to hear the case at bar. Therefore, this Court has subject matter jurisdiction over the case at bar and the second contention of the defendants must be dismissed.

## DECLARATORY JUDGMENT JURISDICTION

Defendants further contend that this Court cannot enter a declaratory judgment against them because the case presents no actual controversy as required by 28 U.S.C. § 2201.

■ ■ In its complaint, plaintiff did allege that its members were in danger of being prosecuted in Florida. Based upon the business of the plaintiff and the interrelationship between the federal and state statutes in question, an actual controversy does in fact exist.[13] On its face, the Florida statute does apply to sound recordings fixed and published both before and after the effective date of 92–140. Although it is possible for state courts to construe state statutes to avoid conflicts with federal statutes, such possibilities go towards the advisability of abstention, not the lack of jurisdiction.

Even though the plaintiffs are not claiming that they have a statutory right to "pirate" sound recordings, they do claim that the federal law immunizes them from the non-federal claim which the defendants have set forth under the Florida statute. The case law regarding anticipated federal defenses in a declaratory judgment proceeding is not entirely clear. However, the rule in Florida appears to be that a declaratory judgment suit based on an anticipated federal defense is a proper basis for federal jurisdiction. In the case of Zaconick v. City of Hollywood,[14] plaintiff sought declaratory relief pursuant to the Declaratory Judgment Act upon the theory that an ordinance of the defendant would violate plaintiff's constitutional rights. The court held that jurisdiction existed because federal constitutional questions had been raised:

> "It is admitted that there is no diversity of citizenship; but it is obvious that the suit is one which arises under the Federal Constitution. . . . A substantial and material Federal constitutional question . . . is involved; and, therefore, diversity of citizenship is not required. . . . The existence of concurrent jurisdiction in the state courts does not deprive this Court of jurisdiction." [15]

Therefore, this Court may issue a declaratory judgment in the case at bar, and the third contention of the defendants must be dismissed.

11. 405 U.S. 1113, 92 S.Ct. 1113, 31 L.Ed. 2d 424 (1972).

12. "The district courts shall have original jurisdiction . . . .:
    (3) To redress the deprivation, under color of any State law, . . . of any right, privilege or immunity secured by . . . any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States. . . . "

13. This Court feels that in view of cases such as Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and National Student Asso. v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969), Feldman v. Ervin, 128 F.Supp. 822 (S.D.Fla.1955) is of questionable vitality.

14. 85 F.Supp. 52 (S.D.Fla.1949).

15. Ibid., 54–55.

## INJUNCTIVE JURISDICTION

Defendant also argues that this Court in reliance on Atlantic C. L. R. Co. v. Brotherhood of Locomotive Engineers [16] is prohibited from granting the injunctive relief here sought by plaintiff.[17]

In that case, the defendant began picketing a switching yard owned and operated by plaintiff. After being refused an injunction in federal court, the plaintiff succeeded in obtaining an injunction in state court. The Supreme Court in a separate action concluded that the defendant had a federally protected right to picket, which could not be interferred with by state court injunctions. Defendant filed a motion to dissolve the injunction, but the state court refused, holding that the Supreme Court decision was not controlling. Defendant then requested the federal court to issue an injunction against enforcement of the state court injunction. The District Court granted the injunction, which defendant argued was proper either "to protect or effectuate" the district court's original denial of an injunction, or as "necessary in aid of" the district court's jurisdiction.

In holding that the federal injunction was improper, the Supreme Court stated that:

"[A]ny injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld. . . . Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court." [18]

It also held that:

"[A] federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear." [19]

However, defendants' reliance on *Atlantic* is misplaced. In the case at bar, we are not asked to enjoin state court proceedings, because none have been initiated. We are asked to enjoin state officials from initiating prosecutions pursuant to a state statute allegedly in conflict with federal law. Such injunctions have been permissible since the case of Ex Parte Young: [20]

"The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional. If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." [21]

This doctrine has been subjected to many legislative and judicial restrictions

---

16. 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed. 2d 234 (1970).

17. 28 U.S.C. § 2283:
"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

18. *Ibid.*, 287, 90 S.Ct., 1743.

19. *Ibid.*, 294, 90 S.Ct., 1747.

20. 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

21. *Ibid.*, 159–160, 28 S.Ct., 454.

over the years.[22] However, under the most recent authorities,[23] a single judge court has been held to have jurisdiction to enjoin the operation of a state statute in situations where a plaintiff claims that the state statute conflicts with a federal statute by virtue of the Supremacy Clause of the Constitution.

In the *Swift* case, plaintiffs sued in district court to enjoin enforcement of a state statute requiring labelling of their product, contending that the statute violated the Commerce Clause, the 14th Amendment and federal labelling requirements. A three-judge district court dismissed on the merits in both its single and three-judge capacities. In defining §§ 2281–84 jurisdiction, the Supreme Court stated that while three judges must necessarily be convened when the complainant alleged Due Process, Equal Protection, Commerce Clause, or Contract Clause arguments, there remained a substantial question as to whether the language "upon the ground of the unconstitutionality of such statute" meant that conflicts between state and federal statutes must also be decided by three-judge courts.[24]

The Supreme Court held that one judge courts were proper forums for such cases:

"The upshot of these decisions seems abundantly clear: Supremacy Clause cases are not within the purview of § 2281 * * * [§ 2281] requires a three-judge court in order to restrain enforcement of a state statute 'upon the ground of the unconstitutionality of such statute.' Since all federal actions to enjoin a state enactment rest ultimately on the Supremacy Clause,

the words 'upon the ground of the unconstitutionality of such statute' would appear superfluous unless they are read to exclude some types of such injunctive suits. For a simple provision prohibiting the restraint of the enforcement of any state statute except by a three-judge court would manifestly have sufficed to embrace every such suit whatever its particular constitutional ground. It is thus quite permissible to read the phrase in question as one of limitation, signifying a congressional purpose to confine the three-judge court requirement to injunctive suits depending directly upon a substantive provision of the Constitution, leaving cases of conflict with a federal statute (or treaty) to follow their normal course in a single-judge court." [25]

Therefore, it is apparent that insofar as the plaintiff's argument consists of the federal/state statutory conflict, this Court has jurisdiction to hear the case and enjoin the defendants from initiating prosecutions pursuant to the Florida statute. Accordingly, the fourth contention of the defendants must be dismissed.

## ABSTENTION

■ Defendants' last preliminary argument is that this Court should abstain from deciding the case at bar. The abstention doctrine has been interpreted by courts to mean that federal courts should avoid the decision of federal constitutional and supremacy questions where the underlying issues may reasonably be

22. Pursuant to 28 U.S.C. §§ 2281–84, three judge courts are generally required before a state enactment may be enjoined.

23. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

24. § 2281:
"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute . . . shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

25. *Swift*, 122, 126–127, 86 S.Ct., 265. Accord, Fitzgerald v. Catherwood, 388 F.2d 400, 407 (2d Cir. 1968).

resolved in pending litigation by interpretations of unsettled state law.[26]

Defendants contend that abstention in the case at bar is required by the recent decisions of the Supreme Court in the Younger v. Harris cases.[27] Those cases, however, are not entirely controlling because in each of them, defendants had been indicted or arrested by state authorities prior to instituting actions in federal courts. Under such circumstances, federal intervention would have interrupted the normal process of orderly state criminal proceedings.[28]

Moreover, plaintiff's reliance on Perez v. Campbell[29] is equally misplaced, because in that case the construction of the state statute was clearly settled. In addition, plaintiff has not alleged either a chilling effect on its First Amendment rights, or a bad-faith prosecution.[30]

There are generally four basic reasons which support abstention: (1) to avoid decision of a federal constitutional question where the case may be disposed of on questions of state law; (2) to avoid needless conflict with the administration by a state of its own affairs; (3) to leave to the states the resolution of unsettled questions of state law; and (4) to ease the congestion of the federal court docket.[31]

In view of the all-encompassing language of the Florida statute, this Court seriously doubts either that the case may be disposed of on questions of state law or that the federal docket congestion will be measurably eased if this Court abstains. This Court also feels that the activities of the plaintiff are national in scope, suggesting that some nationally uniform regulation is desirable rather than a patch-work quilt of contrasting state regulations.[32] In addition, the interests of Florida in the case at bar are not peculiar to that State because of economic or historic interests.[33] At the same time, the interest of the federal government in the subject matter covered by the case at bar is unusually strong.[34]

For all these reasons, this Court has determined that abstention in this case is neither necessary nor desirable. Therefore, the last preliminary argument of the defendants is dismissed.

Before turning to a consideration of the complex substantive issues presented by this litigation, it is desirable to discuss at some length the statutory and case law dealing with copyright protection and, in particular, its application to sound recordings prior to the enactment of the Florida statute and federal amendments in question.

Prior to the enactment of 92–140, the authorities held that sound recordings were not copyrightable;[35] thus, the owner of a master disc could not look to the federal copyright laws for protection

26. E. g., Ry. Comm. of Texas v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

27. 401 U.S. 37 et seq., 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

28. Younger, 41, 91 S.Ct., 749:
"We express no view about the circumstances under which federal courts may act when there is no prosecution pending in state courts at the time the federal proceeding is begun."

29. 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed. 2d 233 (1971).

30. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

31. Wright, Handbook of the Law of Federal Courts, 196–208 (1970).

32. Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

33. South Carolina State Highway Dept. v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938); Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); But see, Dean Milk Co. v. City of Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951).

34. 17 U.S.C. §§ 1–215; U.S.Const. art. I, § 8, cl. 8.

35. White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1909). Capitol Records, Inc. v. Mercury Records Corp., 221 F.2d 657 (2d Cir. 1955), Judge Learned Hand dissenting.

against the making of copies from a copy of the master disc.[36]

As a result, master disc owners turned to the several states to obtain protection, seeking refuge in the laws of unfair competition.

The unfair competition arguments were bottomed on the holding of the Supreme Court in the case of International News Service v. Associated Press.[37] In that case, both parties were competitors engaged in the worldwide gathering and distribution of news. Both International News Service (INS) and Associated Press (AP) assessed each newspaper member of its group the costs of providing the service, and required that the news received by members from the organizations not be furnished to nonmembers prior to publication. AP filed suit to prevent the "pirating" of its news by INS through inducing AP members, by bribery and other means, to furnish news prior to publication, and the copying of AP news contained in early editions and transmitted to INS members.

While recognizing that AP did not have a copyright in the news it gathered and distributed, the Supreme Court, relying upon its equitable powers, held that INS had been engaging in unfair competitive practices which it might be enjoined from continuing:

"[D]efendant . . . admits that it is taking material that has been acquired by [AP] as the result of organization and the expenditure of labor, skill, and money, . . . and that [INS] in appropriating it and selling it as his own is endeavoring to reap where it has not sown, and by dispos-

ing of it to newspapers that are competitors of [AP's] members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of [AP's] legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to [INS] in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business." [38]

Nor was the Court persuaded by the fact that elements of misrepresentation by INS as to the source of its news were lacking:

"It is said that the elements of unfair competition are lacking because there is no attempt by [INS] to palm off its goods as those of [AP]. . . . But we cannot concede that [argument]. Regarding news matter as the mere material from which these two competing parties are endeavoring to make money, and treating it, therefore, as *quasi* property for the purposes of their business because they are both selling it as such, [INS's] conduct differs from the ordinary case of unfair competition in trade principally in this that, instead of selling its own goods as those of [AP], it substitutes misappropriation in the place of misrepresentation, and sells [AP's] goods as its own." [39]

---

36. Before 92–140 was enacted, 17 U.S.C. § 1(e) did provide that a manufacturer making copies from copies of a master disc had to pay a royalty to the copyright owner of 2¢ per record. In view of the great costs incurred in manufacturing master discs—studio orchestras, recording artist contracts, electronic mixing, arrangements—imposition of such a small fee was clearly no effective deterrent to the practice of making such copies. House Report No. 92–487 stated that the

volume of business conducted by "pirates" exceeds $100,000,000 per year.

37. 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918).

38. *Ibid.*, 239–240, 39 S.Ct., 72.

39. *Ibid.*, 241–242, 39 S.Ct., 73. But see the dissent of Holmes, J., 248, holding that AP was merely entitled to have INS give credit to the source of its information. See also the extensive dissent of Brandeis J., 248–267.

Thus, the Supreme Court held that a quasi-property right in the dissemination of news collected by AP could be protected against unauthorized use by a competitor under the law of unfair competition.

The validity of the result reached in *International News Service* has been severely questioned in light of recent judicial decisions handed down by federal court.[40] Two cases in particular may have undermined the legality of certain state unfair competition statutes regulating uncopyrightable works: Sears, Roebuck & Co. v. Stiffel Co.,[41] and Compco Corp. v. Day-Brite Lighting, Inc.[42]

In the *Sears* case, Stiffel Company had secured design and mechanical patents on a "pole lamp." The commercial success of the lamp caused Sears to market a substantially identical lamp, at a much reduced price. Finding the patents invalid for want of invention, the District Court nevertheless held Sears guilty of unfair competition under state law, enjoining it from selling lamps "confusingly similar" to those manufactured by Stiffel, and assessing damages against Sears. The Court of Appeals for the 7th Circuit affirmed the decision.

In reversing the appellate court, the Supreme Court held that a state's unfair competition laws cannot impose liability for, or prohibit copying of, an article unprotected by a federal patent and be consistent with the federal laws:

"Obviously a State could not, consistently with the Supremacy Clause of the Constitution, extend the life of a patent beyond its expiration date or give a patent on an article which lacked the level of invention required for federal patents. * * * Just as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws. * * * To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public." [43]

The Court did say, however, that a state could require that unpatented goods be labelled "or that other precautionary steps be taken" [44] to prevent confusion as to the identity of the manufacturer.[45]

In the *Compco* case, Day-Brite had secured a design patent on a reflector. Comco marketed a substantially identical fixture. Finding the design patent invalid, the District Court, nevertheless, held that Compco had been guilty of unfair competition under state law. The Court of Appeals for the 7th Circuit affirmed the decision.

In reversing the appellate court, the Supreme Court held that:

"[W]hen an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." [46]

Although both *Sears* and *Compco* were suits involving invalid patents, the language of Compco specifically includes copyrights within the scope of its decision limiting the sweep of state unfair competition laws. The interrelationship between *International News Service* on

---

40. E. g., Columbia Broadcasting System, Inc. v. De Costa, 377 F.2d 315, 318 (1st Cir. 1967).

41. 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

42. 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

43. *Sears*, 376 U.S. 231–232, 84 S.Ct., 788.

44. *Ibid.*, 232, 84 S.Ct., 789.

45. E. g., Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 120, 59 S.Ct. 109, 83 L.Ed. 73 (1938).

46. *Compco*, 376 U.S. 237, 84 S.Ct. 782.

the one hand, and *Sears* and *Compco*, on the other, is of crucial importance in understanding the legislative intent behind the enactment of Public Law 92–140. Because sound recordings as such were not afforded federal copyright protection, and since *Sears* and *Compco* seemed to undercut *International News Service* by prohibiting states from providing effective civil or criminal remedies to sound recording owners, Congress chose to place sound recordings within the ambit of protection provided by the federal copyright laws:

> "The purpose of [the bill] is twofold. First, Section 1 of the bill creates a limited copyright in sound recordings, as such, making unlawful the unauthorized reproduction and sale of copyrighted sound recordings. * * * [T]his right is applicable only to sound recordings fixed, published, and copyrighted on or after the effective date of the legislation and before January 1, 1975.

> "Second, Section 2 of the bill provides that persons engaging in the unauthorized use of copyrighted musical works in recordings shall be subject to all the provisions of title 17 dealing with infringement of copyrights and, in the case of willful infringement for profit, to criminal prosecution pursuant to Section 104. U.S.Code Cong. & Admin.News, p. 1567." [47]

The plaintiff argues that since 92–140 stated that "nothing in Title 17, United States Code, as amended by . . . this act shall be applied retroactively", this Court must determine the rights of the respective parties as they existed both prior to and subsequent to the passage of 92–140. There are three main questions presented to this Court for resolution by the case at bar: (1) is the Florida statute unconstitutional when applied to copies of sound recordings published prior to effective date of 92–140; (2) is the Florida statute unconstitutional when applied to copies of sound recordings published subsequent to the effective date of 92–140; and (3) can the statute be interpreted in any manner to avoid its unconstitutionality.

## CONSTITUTIONALITY PRIOR TO FEBRUARY 15, 1972

■ Defendants contend that since Public Law 92–140 expressly stated that it did not affect rights regarding sound recordings fixed prior to February 15, 1972, then judicial decisions holding that remedies existing under state laws prior to the enactment of the copyright amendments were not preempted by the Constitution and remained unaffected by the amendments.[48]

In the case of Tape Industries Association of America v. Younger,[49] a California statute almost identical to the Florida statute was challenged by a plaintiff similar to that in the case at bar. The plaintiff sought a declaration that the California statute was unconstitutional, and an injunction to restrain its enforcement. Plaintiff relied on *Sears* and *Compco*, while defendant relied on *International News Service*. In rejecting the plaintiff's arguments, the Court held that there was an important distinction between imitating a record and physically appropriating the record:

> "[P]laintiffs in the instant case do not imitate the product of the record companies. They actually take and appropriate the product itself—the sounds

---

47. House Report No. 92–487.

48. 17 U.S.C. § 101(e) set forth the federal rights existing prior to the enactment of 92–140. These were that an owner of a musical copyright who had permitted the musical reproduction of the work on discs or tapes could in a civil action obtain an injunction against the unauthorized use of the recording and recover in lieu of damages and profits, a royalty of 2¢ per copy manufactured, as provided in 17 U.S.C. § 1(e). However, if a person made mechanical reproductions without the consent of the copyright owner, and paid a royalty of 2¢ per copy to the owner, no civil action would lie against him.

49. 316 F.Supp. 340 (C.D.Cal.1970), appeal dismissed, 401 U.S. 902, 91 S.Ct. 880, 27 L.Ed.2d 801 (1971).

recorded on the albums—and commercially exploit the product. *Sears* and *Compco* would cover and immunize the plaintiffs here only if they had copied and imitated the product—that is, if they had listened to the sounds performed and embodied on the records and then had expended the necessary sums to copy and imitate the sounds on their own tapes." [50]

Finding that the California statute was directed only against the physical misappropriation of sound recordings, the Court held that no conflict existed with either *Sears* and *Compco* or federal regulation of the copyright field:

"When all of the facts of the case here are considered, we are driven to the conclusion that [the California law] is a tolerable and permissible state regulation directed against theft and appropriation of a saleable product, and does not unconstitutionally intrude on the Federal policies enunciated in the Copyright Clause, . . . and in Federal Copyright legislation. . ." [51]

The Court must have reasoned that since *Sears* and *Compco* did not present the factual issue of physical misappropriation, but rather was based on imitation, neither case required that a contrary result be reached in *Tape Industries*.

With deference, this Court disagrees with the conclusions stated in *Tape Industries*, because it cannot accept the distinction drawn between physical appropriation and copying. If Sears had gone to a store and bought a Stiffel lamp, then made a mold thereof, using the mold for the production of Sears lamps, we would, in this Court's view, have been presented with a situation exactly analogous with *Tape Industries*. If that situation had been presented to the *Sears* Court, the result in that case would probably not have been the least bit affected. The focus of both *Sears* and *Compco* was the artificial creation of patent or copyright protection afforded to unpatentable or uncopyrightable works, not the manner in which the works were reproduced. Although *Compco* permitted state regulation to eliminate confusion as to the source of the work, it did not permit states to prohibit individuals from reproducing the work. Thus, to this Court's way of thinking, the California statute as construed by that Court did intrude upon the federal copyright policies by prohibiting the dissemination of works which could not be afforded copyright protection,[52] and should have been held invalid.

This Court does not believe that each and every state unfair competition law as applied to reproduction of sound recordings fixed prior to February 15, 1972, is invalid; however, it does hold that state criminal statutes, such as those enacted by Florida and California, are necessarily invalid because they are contrary to the intent of the federal copyright legislation as interpreted by the Supreme Court,[53] even if Congress has not preempted the entire field.[54]

50. *Ibid.*, 350.

51. *Ibid.*, 351. That Court also held that it made no difference whether the California statute was deemed a larceny statute or an unfair competition statute.

52. In addition, if the plaintiff in the case had purchased, rather than stolen, the records which they reproduced, it is questionable whether a "larceny" was committed. See, Smith v. Chanel, Inc., 402 F.2d 562 (9th Cir. 1968), reh. den., (1968), which held that a person who has copied an unpatented product sold under a trademark, and refers to that trademark in his advertisements, is not liable to unfair competition laws, so long as the ads do not contain misrepresentation which might confuse purchasers as to the source of the product. See, Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348 (9th Cir. 1964), cert. den. Klix Corp. v. Cable Vision, Inc., 379 U.S. 989, 85 S.Ct. 700, 13 L.Ed.2d 609 (1965).

53. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); Fitzgerald v. Catherwood, 388 F.2d 400 (2d Cir. 1968), cert. den., 391 U.S. 934, 88 S.Ct. 1846, 20 L.Ed.2d 854 (1968).

54. This result is common in the joint regulation of commerce by federal and state authorities.

Defendants also rely on the case of Tape Head Co., Inc. v. R. C. A. Corp.,[55] in which the District Court had granted a preliminary injunction against defendants prohibiting them from filing legal or equitable actions against plaintiff tape pirates. The Court of Appeals stayed the injunction, holding that Public Law 92–140 did not preempt the field of sound recordings:

"The basic premise of plaintiffs is that Congress, in making the mentioned Act pertaining to recordings effective February 15, 1972, thereby manifested an intention to grant persons in the position of the plaintiffs a *carte blanche* right to copy these records free of any restrictions existing under various state laws, common or statutory. The enactment served to make the copyright effective February 15, 1972, and a side effect or implied consequence that Congress thereby preempted this field prior to February 15, 1972, does not follow. In fact, the Act itself provides that its terms should not be applied retroactively or 'be construed as affecting in any way any rights with respect to sound recordings fixed before the effective date of this Act.' Thus, it cannot be said that any actions commenced by defendants prior to that date are void and abortive. It is highly questionable from the authorities presented that plaintiffs have, as a result of the Act of Congress, acquired a right to convert and use these recordings with impunity prior to February 15, 1972." [56]

The Court held that *Sears* and *Compco* were not applicable because:

"The articles [lamps] differ from ideas or compositions, and the Supreme Court has not held that persons who appropriate material such as is here involved are forever immune from suit." [57]

Again, this Court respectfully disagrees with the reasoning expressed by the *Tape Head* Court. While conceding that Congress may not have preempted all state laws, common or statutory, regulating the dissemination of sound recordings, it does not follow that the absence of preemption validates each and every such state law. A state law rendering criminal the unauthorized manufacture and sale of sound recordings flies in the face of *Sears* and *Compco*, regardless of whether Congress has preempted the field.

In addition, plaintiffs do not have a *carte blanche* right to copy these records free of any restrictions under state law: at the very least, they must carefully label their product to avoid confusion as to source. Furthermore, contrary to the characterization of the Court, Public Law 92–140 has not given plaintiffs a new and broadened right to convert and use sound recordings fixed prior to February 15, 1972. The amendments merely retained the status quo as existed prior to the enactment of the law.

The fact that *Sears* and *Compco* dealt with appropriated articles while *Tape Head* dealt with ideas or compositions is not significant. If the Stiffel pole lamp were unpatentable, and Sears had obtained access to the plans and designs of the lamp, then the fact that Sears would have copied the idea rather than the article itself would not have made a difference in the result of that case. Finally, the fact that the Supreme Court has not immunized manufacturers of unauthorized reproductions of uncopyrightable works from suit, in no way means that state laws, such as the Florida statute, are valid exercises of the state police power.

Defendant also relies on the case of Duchess Music Corporation v. Stern,[58] in which plaintiff owners of copyrights

55.  452 F.2d 816, 10th Cir. 1971.

56.  *Ibid.*, 819.

57.  *Ibid.*, n. 1, 819.

58.  458 F.2d 1305, 9th Cir. 1972. Plaintiff here cites the case to show that federal

preemption in the field existed prior to Public Law 92–140. Since the decision of that Court does not mandate that result, and since this Court does not feel that resolution of the preemption issue is necessary for the proper disposition of the

in musical compositions which had been fixed into sound recordings prior to February 15, 1972, sought to enjoin defendant music pirates. In reversing the District Court, the Court of Appeals held that the defendants could not use the compulsory license provisions of the federal copyright laws as a vehicle for copying recorded sounds manufactured by plaintiff:

"The statute provides that anyone who properly invokes the license provisions, 'may make similar use of the copyrighted work.' [Defendant] admits that she duplicated [plaintiff's] copyrighted compositions. She does not make 'similar use' of them, she makes exact and identical copies of them. This is clearly outside the scope of the compulsory license scheme."[59]

This interpretation of the compulsory license provision is based on the misconception that because an underlying musical composition is copyrighted, the unauthorized reproduction of the performance embodied in the sound recording of that composition is, and ought to be, prohibited by the federal copyright laws. If the law were as that Court stated, then record pirates could not exist. In fact, the

law is not what the Court stated.[60] The Court held that *Sears* and *Compco* did not apply because defendant duplicated the records and tapes, thus "stealing" the work of others:

"*Sears* and *Compco* do not sanction [defendant's] outright appropriation, in violation of copyright, of actual performances contained on [plaintiff's] records. [Defendant] may, of course, record [plaintiff's] songs, when she hires musicians, artists, and technicians. Instead, she steals the genius and talent of others. She deceives others into thinking that her tapes represent her own work."[61]

For reasons previously stated, this Court is not persuaded that the arguments founded upon outright appropriations affect the *Sears* and *Compco* holdings. It may very well be that the practice of pirating sound recordings is unsavory or underhanded; yet, the federal law clearly permitted such practices prior to the enactment of 92–140. While Congress may not have preempted all state laws regulating unauthorized reproduction of sound recordings published prior to February 15, 1972, the Florida statute is invalid because it affords protec-

case at bar, this Court does not decide that issue.

59. *Ibid.*, 1310.

60. The legislative history of the federal act shows that the *Stern* interpretation of the law is inaccurate. The House Committee Report, 92–487, stated that if record pirates: "satisfy the cla[i]m of the owner of the musical copyright, [they] can and do engage in widespread unauthorized reproduction of phonograph records and tapes without violating federal copyright law." The Librarian of Congress wrote to the Committee that for controlling music pirates:
"[N]either the present Federal copyright statute nor the common law or statutes of the various states are adequate for this purpose."
The State Department wrote that:
"[A]t present, there is no federal statute that expressly prohibits commercial traffic in unauthorized duplication of legitimate sound recordings."
Nimmer on Copyright, 430–71 (1970) states:

"Assuming such a record pirate duly serves a notice of intent to use, and pays the compulsory license royalties, the somewhat astounding result is that he is not an infringer under the Copyright Act. . . . All of the other elements [except the copyright in the musical composition itself] contained in the original record which he has without authority duplicated are not copyrightable, and hence his use of such elements does not give rise to an action for copyright infringement."

61. *Stern*, 1311. If in fact defendant does deceive others into thinking that her tapes represent her work, then state unfair competition laws may require labelling to show the source of the product. To the extent that cases cited by the Court of Appeals support the view that such copying as defendant manufactured was prohibited by federal law, this Court holds that those cases are contrary to and undermined by both *Sears* and *Compco*.

tion prohibited by *Sears* and *Compco*, and the federal copyright scheme; therefore, it is unconstitutional by virtue of the Supremacy Clause.

## CONSTITUTIONALITY SUBSEQUENT TO FEBRUARY 15, 1972

Defendants strenuously argue that there is no preemption of the field by the federal government regarding sound recordings fixed and published after the effective date of 92–140. First, defendants contend that the federal and state laws are not facially in conflict because a party would not incur the penalty of the one law by obeying the dictates of the other. In light of the absence of an actual repugnancy between the acts, and the stated Congressional purpose to exercise its paramount authority, the defendant contends that the state law should not be set aside, especially when that law is enacted under the police powers of the state.

As previously discussed, Congress has permitted states to regulate copyright to some extent, and this Court finds neither the intent on the part of Congress nor the necessity in interpreting Title 17 as amended by Public Law 92–140 to preempt the field. However, the absence of federal preemption does not in itself validate state statutes regulating the field.

In the case of Hines v. Davidowitz,[62] the Supreme Court was faced with issues similar to those raised by the case at bar. Both a state and the federal government had enacted similar laws regarding a single subject which provided for differing regulatory schemes and criminal penalties. In attempting to determine whether the federal statute had preempted the state statute, the Court stated:

"There is not—and from the very nature of the problem there cannot be—any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress. This Court, in considering the validity of state laws in the light of . . . federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether, under the circumstances of this particular case, [the state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [63]

The Court went on to state that:

"The nature of the power exerted by Congress, the object sought to be attained, and the character of the obligations imposed by the law, are all important in considering the question of whether supreme federal enactments preclude enforcement of state laws on the same subject." [64]

Clearly, there are two gross conflicts between the federal and state statutes involved in the case at bar. The federal statute provides for a twenty-eight year copyright, with a permissible twenty-eight year extension,[65] while the state statute contains no time limitation at all. In addition, the federal statute provides for very elaborate notice and registration requirements.[66] Such requirements prevent inadvertent infringe-

---

62. 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

63. *Ibid.*, 67, 61 S.Ct., 404.

64. *Ibid.*, 70, 61 S.Ct., 406.

65. 17 U.S.C. § 24. After the termination of the copyright period, the work enters

the "public domain" and may be freely copied by anyone without suffering any consequences for infringements.

66. E. g., 17 U.S.C. §§ 10, 13, 14, 19, 20, 30, 31.

ments and the initiation of fraudulent copyright claims. The state statute, however, contains no notice or registration requirements. Under the state statute, an innocent copier could be convicted of selling copies of a sound recording regardless of whether the master disc had been copyrighted. The same result would accrue even if the copying occurred more than fifty-six years after the master disc had been fixed.

In the face of these conflicts, the defendants argue that any discrepancy between the statutes cannot occur until February 15, 2000, twenty-eight years after the earliest possible sound recording copyrighted under 92–140 might fall into the public domain. Even if this argument were correct, its thrust would go only to the question of whether this Court should at this time exercise its jurisdiction, and not whether the state statute is inconsistent with federal law.

Defendants also contend that the federal act on its face limits its effect to sound recordings published prior to January 1, 1975.[67] This argument, too, is irrelevant to the existence of inconsistencies between the two statutes.

These two arguments are bottomed on a third argument which defendants have not specifically raised but which must be considered by this Court: the Florida statute by inference adopts and incorporates provisions of the federal copyright laws dealing with duration, notice and registration.

This Court recognizes that it must interpret state statutes by assigning to them their most reasonable meanings in light of general usage of their words and the legislative intent of their authors.[68] This duty is especially important where a possible conflict between state and federal law exists,[69] because a state law incompatible with federal legislation must yield to that legislation.[70] This is so even though the state had no intention of frustrating the federal law.[71]

Applying these principles to the construction of the Florida statute, this Court is unable to hold that the Florida statute by inference adopted and incorporated the body of the federal copyright laws. Had this result been the intention of the legislature, it could have easily so stated within the act itself. Even if this result were the intention of the legislature, this Court is not at all convinced that statute would be constitutional. At any rate, the Florida statute is merely an attempt to halt piracy of records, and not an effort to erect an entire scheme of copyright protection. Therefore, this implied argument of the defendants must be dismissed. The Florida statute as applied to sound recordings published subsequent to February 15, 1972, is unconstitutional by virtue of the Supremacy Clause.

---

67. 92–140, § 3.

68. A statute should be construed, if possible, to avoid doubts as to its constitutionality; United States v. C.I.O., 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1947), United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). A statute should be given a sensible construction that will effectuate the legislative intent and avoid absurd results; C.I.R. v. Bilder, 289 F.2d 291 (3d Cir. 1961), rev. on other grounds, 369 U.S. 499, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962), American Dredging Co. v. Local # 25, Marine Division, Intern. Union of Operating Engineers, AFL–CIO, 338 F.2d 837 (3d Cir. 1964), cert.

den., 380 U.S. 935, 85 S.Ct. 941, 13 L.Ed.2d 822 (1967), Chemical Bank New York Trust Co. v. S. S. Westhampton, 358 F.2d 574 (4th Cir. 1965), cert. den., 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966).

69. Joseph E. Seagrams & Sons, Inc. v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966), reh. den., 384 U.S. 967, 86 S.Ct. 1583, 16 L.Ed.2d 674 (1966).

70. U.S.Const. art. 6, cl. 2; Sperry v. State of Florida ex rel. Florida Bar, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963).

71. Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).

## CAN THE STATUTE BE CONSTITUTIONALLY INTERPRETED?

Defendants argue that the master disc owners have a common law copyright in their recorded sounds which can be protected by state unfair competition laws, civil or criminal in nature, and that the Florida statute is such a law. This argument raises complex issues of law and must be carefully considered.

While a person seeking to publish his work must proceed through the provisions of Title 17 if he wishes to obtain copyright protection, the federal law specifically permits the retention of common law copyright by the owner of an unpublished work:

"Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor." [72]

This statute permits states to have jurisdiction to hear cases dealing with infringements of common law copyrights, and to regulate such infringements through their own laws.[73] Therefore, if the Florida statute deals with prosecutions for violations of common law copyright, it in no way affects the federal copyright scheme, and may be permissible as an exercise of the state's police power.

Defendants argue that the sound recordings fixed and published prior to February 15, 1972, and those which are fixed and published subsequent to February 15, 1972, but are not copyrighted pursuant to Title 17 as amended, have not lost their common law copyright.

■ The rights given to an owner of a common law copyright are limited in nature. The owner has the right to be the first person to publish the work, and there is no time period in which he must exercise that right, or forfeit it:

"Since the only right the author has under the common law copyright is the right of first publication, common law copyrights are lost through publication; and if the right of the author is not preserved promptly by a proper compliance with the [federal] statute whereby the statutory copyright is secured, all rights are lost through publication." [74]

Therefore, the relevant inquiry is whether the authorized dissemination of sound recordings not copyrighted pursuant to Title 17 constitutes a "publication" of that recording.

■ Clearly, the limited dissemination of a work by performance does not constitute a publication of that work sufficient to deprive the owner of his common law copyright.[75] Equally clearly, at some point, the nature of the dissemination by performance is so great as to deprive the owner of his common law copyright in the underlying work, and constitute an abandonment of the right to reproduce the performance.[76] The

---

72. 17 U.S.C. § 2.

73. Press Publishing Co. v. Monroe, 73 F. 196 (1st Cir. 1896); White v. Kimmell, 94 F.Supp. 502 (S.D.Cal.1950); Berry v. Hoffman, 189 A. 516, 125 Pa. Super. 261 (1937); Kortlander v. Bradford, 116 Misc. 664, 190 N.Y.S. 311 (1921).

74. DeSilva Construction Corp. v. Herrald, 213 F.Supp. 184, 194 (M.D.Fla.1962).

75. Ferris v. Frohman, 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492 (1912); Allen v. Walt Disney Prods., 41 F.Supp. 134 (S.D.N.Y.1941); Mills Music v. Cromwell Music, 126 F.Supp. 54 (S.D.N.Y. 1954). See also, William A. Meier Glass Co. v. Anchor Hocking Glass Corp., 95 F.Supp. 264 (W.D.Pa.1951).

76. R.C.A. Mfg. Co. v. Whiteman, 114 F.2d 866 (2d Cir. 1940), cert. den., 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463 (1940); Shapiro, Bernstein & Co. v. Miracle Record Co., 91 F.Supp. 473 (N. D.Ill.1950); Egner v. E. C. Schirmer Music Co., 48 F.Supp. 187 (D.Mass. 1942), aff'd, 139 F.2d 398 (1st Cir. 1943), cert. den., 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565 (1944). It is important to note that Capitol Records, Inc.

difficulty arises in determining whether the publication in each case constituted a "general publication" or a "limited publication."

Defendant relies on the case of King v. Mister Maestro, Inc.[77] In that case, Dr. King sought a preliminary injunction restraining defendant from selling phonograph records containing parts of speeches he had made in Detroit and Washington, D. C. Prior to delivering the Washington speech, Dr. King had complied with a request to make a text of his remarks available to the press. His speech was broadcast by television and radio, and recorded for newsreels. Defendant made a phonograph record containing part of both speeches and began selling copies to the public.

In holding that Dr. King had not published the speech so as to lose his common law copyright, the Court, quoting Nimmer, stressed that:

"[A] *sine qua non* of publication should be the acquisition by members of the public of a possessory interest in *tangible* copies of the work in question. . . ."[78]

The Court contrasted its factual situation with that presented by the case of Public Affairs Associates, Inc. v. Rickover,[79] in which the defendant had gone:

" * * * beyond customary sources of press or broadcasting in distributing the addresses to any interested individual. * * * Since the distribution was not limited in any way to a particular group, no question exists in this case as to the extent of any limitation so as to avoid 'publication' in the copyright sense. Anyone was welcome to a copy. Nor do we have any problem as to limited use of the addresses by the press for fair comment. The press was free to use the speeches in whole or in part for their news

value. But such ephemeral use is far different from the unlimited distribution to anyone who was interested. * * * "[80]

The Court also noted that such speeches are news items of the first magnitude, and that the public's right to hear such speeches should not extinguish the author's common law copyright.[81]

█ This Court believes that the *Rickover* case is more analogous to the case at bar than the *King* case for several reasons. First, the master disc owners make no attempt to limit the distribution of the sound recordings which they manufacture. Second, the master disc owners make tangible reproductions of performances embodied in sound recordings. Third, there is no news value in the sound recordings issued by record companies or record pirates. Therefore, this Court holds that authorized dissemination of recorded sounds manufactured from a master disc constitutes a "general publication" of both the underlying composition and the performance sufficient to deprive the owner of any common law copyright to which he might have been entitled.

Once the records and tapes are generally distributed to the public, the performances embodied within the recorded sounds lose common law copyright protection. As a result, it is impossible to save the challenged Florida statute by limiting its effect to recorded sounds in which common law copyright exists for the obvious reason that there are no recorded sounds in which common law copyright exists. Therefore, defendants' argument that the Florida statute can permissibly regulate common law copyright must be denied because there is no common law copyright to persons who distribute such sound recordings.

---

v. Mercury Records Corp., 221 F.2d 657 (2d Cir. 1955), on which defendants heavily rely was decided prior to *Sears* and *Compco*.

77. 224 F.Supp. 101 (S.D.N.Y.1963).

78. *Ibid.*, 107.

79. 177 F.Supp. 601 (D.D.C.1960), rev. 109 U.S.App.D.C. 128, 284 F.2d 262 (1960), rev. 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962).

80. *Rickover*, 284 F.2d 270–271.

81. *King*, 224 F.Supp. 107–108.

Having determined that the challenged Florida statute is unconstitutional when applied to copies of sound recordings published both prior to and subsequent to the effective date of Public Law 92–140, and having decided that the challenged statute cannot be interpreted in any way which might avoid its unconstitutionality, this Court holds that the relief sought by the plaintiff will be granted and that sought by the defendants will be denied.

(1) The Florida statute is declared unconstitutional.

(2) Defendants are permanently enjoined from initiating prosecutions pursuant to the Florida statute.

Submit order.